Messrs. Montgomery and Bates for respondent.

August, 1862.

---

# SUPREME COURT—IN EQUITY.

### ISAAC MONTGOMERY *vs.* DANIEL MONTGOMERY.

A, THE OWNER of a valuable estate, conveyed it to B for a nominal consideration, to be held in trust by the latter for the benefit of the complainant, the aforesaid A—B to manage the same, and to receive for his compensation as manager one-third of the profits arising from the estate, and the complainant the remaining two-thirds. B, after holding the estate for a term of years, at the request of the complainant, executed a deed, also for a nominal consideration, to C, the complainant's brother, the respondent in this suit, the *habendum* in the said deed, reciting that C was to hold the property *in like manner as B had held the same.* There was a verbal agreement that the complainant should draw from the receipts of the estate a certain sum per month, and that the respondent should receive for his services one-third of the profits of the business, and complainant two-thirds; the monthly payments to be accounted for on the final settlement. The respondent paid the monthly stipend for a space of time, but made no settlement; latterly, the respondent refused to pay the complainant anything, and denied that he had any interest in the estate.

The complainant prays that an account may be taken, and the amount due him ascertained, and the respondent decreed to pay the same, and that he be ordered to convey the estate to the complainant.

Held: that a resulting trust may be established by parole evidence, although the grantee denies the trust in his answer; but the evidence must be full, clear and satisfactory.

The general rule of law is, that parole evidence is not admissible to create or modify interests in real estate, except in cases of fraud or mistake. But

Isaac Montgomery *vs.* Daniel Montgomery.

trusts, resulting by operation of law, are expressly excepted from the statute of frauds.

A trust may be established, when the consideration of a deed moves, as in this case, from the complainant, and not from the grantee; and the facts on which the trust arises may be shown by parole proof, in opposition to the language of the deed.

The trust being proved, parole evidence is also admissible to define its nature and operation.

The *cestui que trust* is regarded, in a Court of Equity, as the real owner, for the beneficial interest vests in him; and the respondent purchasing the estate with the knowledge of the trust, the conveyance would be subject to it.

The beneficiary has a right in equity to dispose of the estate, and such disposition is binding on the trustee.

The main question in determining whether the trust has been created, is upon the sufficiency of the evidence by which it is sought to be established.

The *cestui que trust* having resumed the legal ownership of the estate from the hands of the first trustee, and directed to whom a fresh conveyance should be made, without consideration: Held, that a resulting trust arose in favor of the complainant.

Respondent decreed to convey the estate and render an account of his administration.

ALLEN, C. J.

An abstract of the bill and answer have hitherto been given by the Court on questions which have arisen in the progress of the investigation, and, therefore, I shall only advert to the allegations, as they involve questions material to the issue now presented.

The complainant avers that he conveyed to Charles W. Vincent, for the nominal consideration of $8,000, on the 4th of September, 1849, an estate on the Island of Oahu, called the Puuloa Salt Works; the design being that Vincent should hold the estate in trust. And it is alleged in the bill that the stock and furniture were purchased by the complainant or by his funds; and further, that the estate was mortgaged by said Vincent to B. F. Angel for the sum of $5,000, and that the money arising therefrom was received by the complainant and said Vincent, and that the latter gave his note for the amount he had received to the respondent, who, on the 20th of July, sued said note and recovered judgment thereon; and further, that said mortgage was paid by raising money on the estate. He further avers that he invited his brother, the respondent, to come to this

country, where he arrived on the 17th February, 1855, and that he paid his passage, for the respondent was in destitute circumstances ; and that on the 20th June of the same year said Vincent, by the request of complainant, executed a deed to the said respondent of the estate for and in consideration of $15,000 (fifteen thousand dollars) ; and he further avers that the consideration was nominal, that no money was paid to Vincent by respondent, that he was at the time without means, or credit, and that the object of the deed was that the estate might be held by him for the benefit of the complainant, who says that there was a verbal agreement with his brother that he should draw from the receipts of the property one hundred dollars per month ; and that at the end of each year, the respondent should receive for his services one-third of the profits of the business, and the complainant two-thirds; and that the one hundred dollars per month was to be accounted for on final settlement ; that the respondent continued to pay him money, but no settlement has been made ; but of late he refuses to pay him anything, and denies that complainant has any interest in the estate ; and the complainant further alleges that it was expressly understood and agreed, that when he might desire it, the said estate was to be conveyed to him, or to whomsoever he might direct ; that he has made repeated efforts for a settlement, but without success ; that the respondent has offered only to give his notes, secured on the estate for ten thousand dollars, payable in seven years, which he regards as wholly inadmissible, as the estate cost him fifty thousand dollars, besides many years of toil and care, since 1842.

The complainant prays that an account may be taken of all the dealings and transactions of the respondent touching the Puuloa Salt Works, from the 19th of June, 1855, till the day of filing this bill, that the amount due the complainant may be ascertained, and that the respondent may be decreed to pay the same ; and, also, that the said respondent may be ordered to convey the estate to the complainant.

The respondent admits in his answer that the conveyance of the property was made to Vincent, and believes that the consideration of eight thousand dollars is correct ; but does not know whether the estate was held in trust or not, or whether

it was conveyed to enable Vincent to manage the property. better for complainant's interest, but believes it to be untrue.

He denies that he came to this country in destitute circumstances, for he was skilled in the art of ship-building, as well as having general business qualifications, and with sufficient means at his command to establish himself independently of his patronage ; and he further says that he does not know whether said deed from Vincent was executed at the request of complainant, but denies that the sum of fifteen thousand dollars, as stated, as a consideration in said deed, was merely nominal, but states that it was the price at which he purchased the estate of said Vincent, who sold him the same on time, secured by his negotiable notes and mortgage of the estate ; and he denies further that the intent and object of the conveyance was that he should hold the estate for the use and benefit of complainant, or for the purpose of enabling himself to manage it with more facility, for the use and benefit of complainant.

Defendant further says he has no "personal knowledge whether the complainant, as in bill alleged, continued until the 20th of June, 1855, to enjoy a large or any portion of the proceeds of the said estate, or whether the same, if true, was, or was not, according to an agreement in bill alleged, as between the complainant and the said C. W. Vincent ; or whether the said Vincent in fact held the estate in trust for the use or benefit of the complainant, as in bill alleged ; or whether said writing was made for the purpose of enabling the said Vincent to manage the said estate more effectually for the use or benefit of the complainant ; or whether the said Vincent received for his alleged management one-third or any other, or what part of the proceeds, of the said estate, but saith this defendant is credibly informed, and verily believes, and therefore avers, that all the said above last-mentioned statements and allegations are without any foundation in fact, and were never alleged by the complainant, in any of the intercourse between them, since defendant arrived in this Kingdom." He further avers that he supposed the furniture was Vincent's, because complainant never made any claim to it ; and that the stock of cattle referred to were sold by order of complainant, and purchased by respondent. He says further, that the mortgage to Angel was made by

him as the sole and *bona fide* proprietor, and denies that Vincent gave him a note for any part of the loan. The note was for another consideration.

The respondent denies that he holds the estate in trust, and avers that he purchased it for fifteen thousand dollars ; that he paid no part of the consideration at the time, but that he has since paid large sums of money to the complainant. He denies further that he was under obligation to convey to complainant, on request, or to any one else, whenever he might direct, and denies all efforts at settlement. The complainant replies that he does not know whether the mortgage and notes for fifteen thousand dollars were executed, or whether they were delivered to him, as at the time he was in great mental trouble ; but avers if such papers were signed they were merely for form, and no such mortgage is now recorded ; and that for the space of one year from the 3d day of October, 1855, the defendant had possession of all repliant's papers ; and if such papers were executed, their present existence is unknown to this repliant, and if any exist, are in the possession of defendant. The repliant further says that the cattle referred to in the answer were offered for sale, but there being no purchasers, the cattle were bought in by the respondent, and no money was ever paid by defendant or received by complainant.

The counsel for the complainant avers that Vincent held the estate in trust for him, with the understanding that he would convey it to whomsoever the complainant might direct, and that in pursuance thereof, he made a conveyance to the respondent, to be holden for complainant as Vincent had held it, and that the respondent has been in the same relation as trustee.

The counsel for the respondent contends that, as the deed is absolute in its terms, a trust cannot be established by parole testimony.

It is a general rule of law that parole evidence is not admissible to create or modify interests in real estate, unless in cases of fraud and mistake. But trusts resulting by operation of law are expressly excepted from the operation of the statute of frauds. The doctrine that a trust may be established when the consideration of a deed moves, as in this case, from the complainant and not from the grantee, is fully sustained by Chan-

cellor Kent in the case of Boyd vs. McLean, 1 Johns. Ch. R., 582 ; as when A purchases an estate with his own money, and the deed be taken in the name of B, a trust results by operation of law. This is a well known and a universally admitted rule in equity. The point raised is whether such a trust be within the statute of frauds, and whether the facts on which the trust arises may be shown by parole proof, in opposition to the language of the deed, and in opposition to the defendant's answer. The trust must result from the facts proved. (Botsford vs. Burr , 2 Johns. Ch., 405 ; Dow vs. Jewell Foster, 470 ; But Root vs. Blake, 14 Pick., 27.) When the trust is proved, parole evidence is admissible to define its nature and operation. (4 Bran. Ch., 472.)

It is often a very difficult question to determine what facts will create a trust by operation of law. (Pembroke vs. Allenston, 1 Foster, 107 ; 13 John., 463 ; Jackson vs. Mills ; Boyd vs. McLean, 1 Johns Ch., 272.)

The statute of frauds declares that " all declarations or creations of trusts and confidences of any lands, etc., shall be manifested and proved by some writing signed by the party, who is, or shall be by law, enabled to declare such trust, or else they shall be utterly void." The statute, however, excepts the case when any conveyance shall be made of any lands, etc., by which a trust or confidence shall arise or result by implication or construction of law.

In the case of Botsford vs. Burr, 2 John Ch. R., 408, Chancellor Kent says that such a resulting trust may be established by parole proof, and the difficulty in all this class of cases is whether the facts make out a resulting trust. In all cases where the money is paid by one person, and the deed taken in the name of another, a resulting trust arises ; but if the party did not pay the money, he cannot be permitted to prove that the purchase was made for his benefit, or on his account. The trust may be established by parole, although by the deed an acknowledgment is made that the money was paid by the nominal grantee. (Foot vs. Calvin, 3 Johns, 216 ; Suthrie vs. Gardner, 414—19 Wendall ; Lowusburg vs. Purdey, 16 Barber, 376 ; Peabody vs. Turbill, 2 Cushing, 236 ; Lynch vs. Cox, 11 Johns, 265 ; Buck vs. Pike, 2 Fairfield, 9, 23 ; Baker vs. Vining, 30 Maine, 121, 125 ; Smith vs. Burnham, 3 Sumner, 435, 438.

I regard it settled by the authorities that a resulting trust may be established by parole evidence, although the grantee denies the trust in his answer ; but the evidence must be full, clear and satisfactory. (3 Story, 181 ; 2 Story's Eq., 68 ; Hill on Trustees, 91 ; 1st Leading Cases in Equity, 274—note and authorities there cited.

The *cestui que trust* is regarded in a Court of Equity as the real owner, for the beneficial interest vests in him. So that if the respondent had purchased the estate with the knowledge of the trust, the conveyance would be subject to it. He has a right in equity to dispose of the estate, and any disposition made by him is binding on the trustee. (Root *vs.* Blake, 14 Pick., 271.)

As early as the time of Lord Hardwicke, in the case of Lloyd *vs.* Spillot, 2 Atk. R., 150, the principle of a resulting trust was recognized as arising by operation of law, where an estate was purchased by one person and the consideration was paid by another. He who pays the consideration is regarded in equity as the owner. He went farther in the case of Willis, 2 Atk., 72, and was of opinion that parole evidence might be admitted to show the trust from the poor circumstances of the pretended owner of the real estate or inheritance, which made it impossible for him to be purchaser. (Linch *vs.* Linch, 10 Vesey, 518.) And this doctrine is equally applicable to personal as well as real estate. In the case of Dyer *vs.* Dyer, 2 Cox, 92, Lord Chief Justice Baron Eyre says that " the clear result of all the cases, without a single exception, is that the trust of a legal estate, whether freehold, copyhold or leasehold ; whether taken in the names of the purchaser and others jointly, or in the names of others without that of the purchaser ; whether in one name or several ; whether jointly or succession, results to the man who advances the purchase money, and it goes on a strict analogy to the rule of common law, that where a feoffment is made without consideration, the use results to the feoffor."

Mr. Justice Story says that this principle was recognized in a very short time after the passing of the statute of frauds of 29 Charles 2d, in an anonymous case in 2 Ventris, 361, and that the doctrine of that case has never been departed from, but has been recognized in a great variety of decisions. The ques-

tion whether parole evidence is admissible to establish the manner of paying the purchase money, has been involved in doubt. But Justice Story and Chancellor Kent, after a very thorough examination of the subject, have decided that parole evidence is admissible to ascertain the trust. The same doctrine is maintained by the English authorities. The trust arises upon the ownership and payment of the money, and not upon a contract entered into on the part of the trustee. (Pritchard *vs.* Brown, 4 N. H. Rep., 410 ; 4 Kent, 305 ; 2 Story's Equity, § 1201.)

Chancellor Kent says, that a trust is merely what a use was before the statute of uses. It is an interest resting in conscience and equity, and the same rules apply to trusts in chancery which formerly applied to uses, and in exercising its jurisdiction on executory trusts, the Court of Chancery is not bound by the technical rules of law, but takes a wider range in favor of the interest of the party. (Fisher *vs.* Fields, 14 John. R., 505.

A more difficult question than one of law arises on the sufficiency of the evidence to establish the trust, as alleged by the complainant. A careful analysis of the testimony is necessary to form an opinion upon this very important point. Mr. Vincent testifies " that in 1848 he loaned the complainant $5,000, who gave him security on the lease which he then held of the Puuloa Salt Works and the salt there manufactured. The complainant went to California in 1848, and on his return in 1849, he purchased the title of the estate, and he conveyed it to him to secure the original loan, and a further advance, making the amount $8,000. And it was agreed at the time that he was to have one-third of the profits for his superintendence, the complainant one-third, and complainant's wife one-third; and it was distinctly understood, that on the payment of the $8,000 and interest, he was to re-convey the estate." He says further : " We made a settlement in 1853, and I received full payment of complainant's indebtedness, and then desired to re-convey the estate. I received one-third of the profits for managing the estate. I considered the estate sacred, and I made provision to protect the complainant in my will. I thought the estate worth four times the amount he owed me. After my settlement

Isaac Montgomery *vs.* Daniel Montgomery.

with the complainant, the title remained in me for about one year and a half, and I expressed a wish to complainant to reconvey the estate to him, and the complainant replied, ' Oh, let it remain.' I mentioned the same thing to him again and again, and his answer was always the same. I thought the estate had better remain in my hands, as complainant was at that time intemperate, and sometimes his conduct was imprudent." Witness says he had rescued him from many troubles, that he felt the responsibility of the trust, and desired to get rid of it. However, the title remained in him till the arrival in this country of the respondent, and Isaac then said to him after introducing his brother, " I will now take the deed of the land, and in preparing the deed, insert my brother's name in place of my own, and set the sum in the deed at $15,000." He applied to Judge Harris, and he drew the deed for the land and the mortgage, and three notes of $5,000 each at six, twelve and eighteen months. The notes and mortgage, I am under the impression, were made for the purpose of blinding Mr. Harris, the object being to put Mr. Daniel Montgomery in trust, and lead people to believe he owned the estate." He goes on to say, " I think I delivered them to the respondent. I did not endorse the notes or assign the mortgage. I had no negotiation with the respondent about the estate, and never received any money from him, or any one else, for the Puuloa Salt Works."

The household furniture on the estate, at the date of the deed to him, belonged to the complainant and his wife ; that he never claimed to own it ; that there were also cattle, horses, carts and canoes belonging to him ; that there was also a large amount of lumber on the estate, and a large amount of goods belonging to the complainant, when he conveyed it to the respondent. It was the season for the manufacture of salt, and the goods were required to pay the natives for their labor. That there was a schooner belonging to complainant which was worth $2,000, and the respondent six or eight months ago, came and asked him for the papers of the schooner, to which he replied that he had none, but thought that he would 'find them among the complainant's papers. That respondent replied that he had made search and they were not there. He referred him to the Registrar's Office. Respondent then said that he intended

to send her coastwise for wood, and that he could not send her without her register. That respondent then requested him to accompany him over to the Registrar's Office and there acknowledge the transfer of the schooner. That he did so, thinking of course, whether he went with Daniel, Isaac or his wife, it was the same. "The respondent never paid me one cent for the vessel. When I made the loan of $5,000, the complainant held the property under a lease from Kekauonohi, and my security was a mortgage of the leasehold property as well as the salt at that time manufactured. After the complainant purchased the property, I returned the mortgage to him and made an additional advance, which, together with the interest, amounted to $8,000, to secure which the complainant conveyed the estate to me." Mr. Vincent further says Mr. Jasper recommended him to take this course, as the most proper one. It was by his advice that he took the absolute conveyance, and by that deed he was proprietor of Puuloa. He says " I did not consider that I had a right to dispose of it. I held it as a trust for complainant. I supposed I acted as his trustee. He was aware when he made the mortgage that he did so for the $8,000. It was so mutually understood. During the time I held the title in 1854, I negotiated a loan of Mr. Angel for $5,000, at the request of the complainant, and mortgaged the property to secure it. We divided the money equally, and after final settlement and delivery of a deed of the estate to respondent, I gave him my note for the amount."

The witness then makes a statement in relation to the management of the estate by him, and its comparative condition when conveyed to the respondent, with the present time, as conducted by the respondent. Mr. Vincent is asked whether he has not declared to respondent, that Mrs. Montgomery, wife of complainant, has said to him (Vincent) that if Isaac got the property he should get half of it. He denies having any conversation with him (Mr. Bates) in regard to any conversation with Mrs. Montgomery about the property, and he denies having had any with her about it. He is interrogated in relation to a conversation with R. G. Davis, Esq., who was retained as counsel for the respondent, and he says that he does not remember that he stated to him, or any other man, that the wife of

complainant had been to him with tears in her eyes, beseeching him. He says Mr. Davis called on him, and after some preliminary conversation, touched upon this case, and inquired his opinion of the party he thought would win. The witness replied that Mr. Bates, Mr. Harris and Mr. Montgomery had called upon him, and that he had refused to speak to them, and that he should decline to speak to him upon the subject. He further says that he did not say to Mr. Davis that he was a poor man, or having large medical bills to pay, or that he was of more consequence in the suit than all the lawyers engaged in it. Neither did he state that he should like employment at Puuloa, if the respondent succeeded in the suit. He did not say, by sign, symbol, word, token, or by any other sign, that if a large fee was placed at Mr. Davis's disposal for his benefit, that it would be for respondent's advantage, or anything to that effect. He denies having stated to Daniel Montgomery that he wanted pay. He further testifies that the respondent had made propositions to him of subordination, at his own house, and shortly before the arrival of the "Speedwell" on her last trip. He stated that on her arrival he expected to be in funds from a large shipment he had made, and would give him $1,000 if he would favor his cause. He spoke to him of the three $5,000 notes. He says he made no reply when the respondent offered him the $1,000. The respondent was impressing witness' mind thus. He said to him, Vincent, "You sold Puuloa, and I gave you in payment three notes of $5,000 each. You gave those notes to the complainant, with your endorsement on the back. Those notes I have since paid, and if they are not paid, let him, Isaac, produce them." "Now," says Vincent, "I was to support him in that, and for my support I was to have $1,000. I did not support him, for I prefer to speak the truth in this Court among men. I have never communicated this to any one until to-day on the stand."

Mr. Vincent further says: Mr. Bates called on him and handed him the bill in this case, and we had some conversation in relation to the note, and I told Mr. Bates I thought the note was given for a house and lot in town and a schooner, but, he says, I was in doubt at the time. A short time afterwards Mr. Bates called again and read the answer. I then told him that the

note was given for my part of the Angel money; for on reference to my books I found that the house had been settled for by lumber and cash. This testimony is contradictory to the answer, and if the respondent received the note for any other consideration he has failed to show it. In either case, whether the note was given for the money received from Angel, or for the house and lot and schooner, the consideration was from the complainant, therefore I do not see that it is material, except on the score of credibility. The witness has given the best evidence of the transaction, relying upon his memory and his books; and the respondent has failed to give any support to this averment in his answer. The weight of evidence, as it stands, is clearly for the proposition that the note was given for moneys received of Angel. He says that the respondent was to hold the property as he held it, and that he was to take three notes for $5,000 each, and a mortgage. The notes were signed, and he took all the papers, notes and mortgage and gave them to Isaac Montgomery. His conversation in relation to the negotiation was entirely with Isaac. The mortgage was made to him in the ordinary form. I have never seen the mortgage and notes since.

Mr. Davis testifies that Vincent stated that he had nothing to gain by this suit, if it went either way, and thought that the only benefit he could derive would be employment in the line of his business, on the property, and it may be that I conveyed the idea to the minds of my associates. I cannot say that Vincent stated he was of more consequence than all the lawyers. I do not recollect of having made such a statement to others. I have never insinuated that Mr. Vincent had stated to me that he wished money placed at his disposal, and I never gave assent to a question involving this to Mr. Bates or Mr. J. Montgomery. I had a general conversation with these gentlemen, and told them that I thought Mr. Vincent's testimony would be adverse to our client. He then stated to Mr. Bates, there is one important matter in this case which I will disclose to you confidentially, that $1,000 has been named as the price of Vincent's testimony, and Mr. Bates said, Yes, that is what I wanted to know about. I said, then, Mr. Bates, I wish you to understand that I named it to my colleague, Mr. J. Montgomery, but

the proposition did not come from Vincent. Montgomery replied, Yes, it was named to me by you, but not as coming from Vincent. Mr. Bates asked me whether Montgomery did not think it came from Vincent. I replied that Mr. Montgomery might have received that impression, rather than that I conveyed it. I infer that he might have received that impression from the fact that my colleague, Montgomery, afterwards told me that the respondent said that he had given Vincent $300. Mr. Davis said that Mr. John Montgomery had called on him to put him right with Mr. Bates, in relation to the interview at Mr. Bates' office, between all the counsel and the respondent. Mr. Vincent stated to me that Mr. Daniel Montgomery had said to him that if he wanted $1,000 to use, he would let him have it. I asked him if it was not in the light of a loan, and he replied, perhaps it might be so. I did not then regard the statement of Mr. Vincent as a declaration that respondent had attempted to bribe him at that time. I told the respondent what I had learned from Mr. J. Montgomery, that he had given Vincent $300. I never told what Vincent had said. I never told it to Mr. Bates as associate counsel, for I did not know what to think of it. I asked respondent whether he had given Vincent $300, and he replied that he had not given him $300, but had loaned it, and had his note for it. I do not remember that there has been any discussion with the counsel and respondent about the $300 or the $1,000.

Mr. Vincent states, in his cross-examination, that the respondent had stated to him that he was not sure whether to prosecute for the whole estate, or for services rendered for seven years. The respondent was very severe in his remarks on his brother, but he advised him to a milder course. He never stated to him that he would succeed in his suit, or advised him not to compromise it. And Mr. Davis testified that Mr. Vincent never said to him that if respondent got the salt works he would be glad of employment there ; and that he never stated to any one that Vincent had so stated. Mr. Vincent never signified by sign, symbol or token, that if a large fee was placed in my hands for him, that it would be for the respondent's benefit. I never stated this to any one. I have never been charged with any such thing. I have been asked by my associate counsel whether

Isaac Montgomery *vs.* Daniel Montgomery.

I have not made such a statement. Mr. Vincent said, all the counsel and the parties have called on me for the purpose of having a conversation on the subject matter of the suit. He said to me that Mrs. Montgomery, the wife of complainant, had been to see him ; she was an intimate acquaintance of his wife. He said that she had said to him, " Charles, let us have the property." He said, all I could say to her was, that he had not the power to give her the property, and she repeated her solicitations, without appearing to understand what I had said to her. She replied, if you will give us the property, we will give you anything you may want, and you may have half of it. Mr. Vincent said to her she was *hewa* (wrong) to talk in that way, and that all he had to do was to speak the truth. He said that the woman appeared to be out of her head. He never intimated anything about a reward, after he had spoken of the case. He told Mr. Vincent that if he declined to give me any light on the case, he should not press it. Vincent added that he had no partiality for either of the parties, and that he thought there was no one who knew so much of the case as he did. There was some other conversation, and he stated he had sickness in his family of late years, and that his physicians' bills had been very large. I never made any suggestion that he, Vincent, could be bought. I never stated that a large sum would buy Vincent.

Mr. Bates, counsel for respondent, testified that his client informed him that Mr. John Montgomery, associate counsel, had stated to him that Mr. Davis had said that Vincent had made a proposition that for $1,000 his testimony should be favorable to respondent, and at a meeting of counsel and client, the question was put to him whether he had made such a communication, and whether Mr. John Montgomery had proposed to Mr. Daniel Montgomery to deposit with him, Mr. Davis, $1,000, which was to be retained by him to abide the issue of this suit, for the benefit of Mr. Vincent, to which Mr. Davis replied, " That is false." Solicitor Montgomery was excited at this reply because he had understood Mr. Davis differently, and said, " Robert ! I can't stand that." Mr. Bates further testified that Mr. Solicitor Montgomery said to Daniel, in his presence, that he had told him that he, the respondent, had given $300, and that the re-

spondent replied that is not true. I did let him have $100. He came to me in distress, and I loaned, or gave, (witness does not remember the word used,) him $100. Mr. John Montgomery re-asserted the statement as made by the respondent, who stated further that Mr. Vincent had applied to him for aid, and he had stated to him that he did not know how he was going to be situated, but "if I can I will help you." The respondent said he had been advised to make this communication to witness, in relation to the statements alleged to have been made by Mr. Davis about Vincent's testimony.

Solicitor Montgomery testifies that Mr. Davis did not use any expressions in conversation with him that Vincent could be induced to give evidence either on one side or the other, by any valuable consideration; but the impression left on his mind was that, as Vincent had talked about getting half of Puuloa, and as the respondent told him so, as well as Mr. Davis, and his remarks in relation to hard times, I inferred that $1,000 was in some shape or way a sum which Mr. Davis thought might operate on Vincent's testimony. He felt there was a risk of Vincent being induced to deviate from the truth, which, from Mr. Bates' statement, were on respondent's side of the case. Solicitor Montgomery then made a communication to his client, of the impressions he had derived from Mr. Davis. He stated to his client that it appeared to him that Vincent expected some inducement to keep him on the right track in his testimony, and he thought $1,000 was the inducement, to which the respondent replied: "I have paid that man $300, and I can't afford it."

Solicitor Montgomery says he expressed surprise at this course. These remarks of Mr. Davis were undoubtedly the cause of this idea in the mind of the solicitor that Vincent was open to a bribe. The solicitor was interrogated whether he had not stated that Vincent wanted $1,000 for his testimony, and whether the respondent was not a fool not to give it. He replied that his client had given $300, as he said, and which he had no reason to doubt, and that increasing the sum was not increasing the offense, and that he had said jocularly "that he might as well go the whole hog." He denies explicitly that he ever advised respondent Montgomery to make the overture.

The witness further says : That " when he said at the inter-
view of the counsel and client, 'I can't stand that, Robert,' I
was under the impression that Mr. Davis meant to convey a
denial that he had made any communication to me on the sub-
ject of his interview with Vincent, and I did not refer to the
statement of $1,000 being deposited with Mr. Davis for Vin-
cent's benefit.   Mr. Montgomery says he desired Mr. Bates to
accompany him to Mr. Davis's house, for the purpose of having
Mr. Davis correct what he thought was unjust toward him, in
the statement made by Mr. Davis in Mr. Bates' office, which I
understood to be a denial that he had communicated anything
to me about' Vincent, and the $1,000, so much talked about.
This interview was had, and explanations made, and whatever
misunderstanding existed in relation to the offer of $1,000 was
removed by Mr. Davis by the declaration that the proposition
did not come from Mr. Vincent, to which Mr. Montgomery re-
plied : 'Yes, it was named to me 'by you, but not named as
coming from Mr. Vincent.' "

The first question which arises is, whether any of the facts
disclosed create doubts as to the truth of the testimony of Mr.
Vincent ; for if a man has accepted, or offered to accept a bribe,
his evidence can have no weight with the Court, unless fully
sustained by the most reliable witnesses, or by circumstances
of the strongest character.

That Solicitor Montgomery made this impression on the mind
of his associate counsel, Mr. Bates, is undeniable.   But had he
any ground for entertaining such an opinion of Mr. Vincent ?
Mr. Davis attempted to have a conversation with Mr. Vincent
in relation to his knowledge of the facts involved in this case,
and of the character of the testimony which he would give,
but he studiously avoided it.   The introduction to the conver-
sation is not material ; although, it may be remarked, that it
was more Masonic in its tone and manner than professional.   It
appears that they were early friends, and that they entered
upon a very free conversation on their private affairs, of their
business, of their personal condition.   Mr. Vincent said his
business was poor and times were hard.   In the course of the
conversation he said that the respondent had stated to him if
he wanted a thousand dollars to use he would let him have it.

Thereupon Mr. Solicitor · Montgomery infers that he wants money for his testimony, and so states to the respondent, who communicates it to Mr. Bates. But, when this understanding of Montgomery is communicated to Mr. Davis, he indignantly repudiates it, and says that no such intimation had been given by Vincent. The question arises, then, has not Mr. Davis made different statements of the same transaction ? He denies emphatically that Vincent had offered him his testimony for $1,000 ; when the conversation was had between the counsel and respondent, Solicitor Montgomery says that from Mr. Davis' account of the interview he inferred that Vincent wanted a consideration for his testimony, and that $1,000 would be the inducement. The deductions made by Solicitor Montgomery were not logical. In a private conversation with an old friend, a man may be permitted to talk of his reverses and his misfortunes without being thought to have made an implied overture of money for his testimony.

The account given by Mr. Vincent and Mr. Davis, under oath, of the interview, is perhaps as near in conformity as is usually made. They agree in all the material points of the conversation, with the exception of an appeal made by Mrs. Montgomery, wife of complainant, to save the estate for them ; and my own view is, from a very careful examination of this testimony, that the testimony of Davis has been consistent with the declarations made by him to his associate counsel. Mr. Montgomery drew inferences which were not legitimate ; and there is no propriety that Mr. Davis should be answerable for them. There is certainly no ground for the opinion that Davis had changed his version of the conversation to shield Vincent from the charge of having made overtures for his testimony.

In connection with this discussion upon Mr. Davis' testimony, it is well to recur to Vincent's, for the purpose of testing its accuracy and truth. He had the title of the estate for about 6 (six) years, and had charge of the business for about four. His books give a clear history of the transactions of the Puuloa Estate. His memory is as sound and retentive as could be expected of events which transpired so long ago. He has answered freely and fully every question which has been put to him. His settlement with his *cestui que trust* seems to have been entirely

satisfactory.  His regard for the sacredness of the trust, by providing for it in his will, made especially for that purpose, was highly honorable to him.  I see no act of his, in this whole transaction, of trick or artifice to retain the estate, or obtain any interests or rights adverse to the *cestui que trust*.  He had the fullest confidence of the complainant, judging from the time and the manner in which he held the estate, for he had repeatedly urged him to take a reconveyance.  In his tone and manner on the stand, he has not exhibited any partialities, but throughout has given full, free and frank statements upon all matters upon which he has been so elaborately interrogated. His testimony has, in many instances, been sustained by collateral evidence, and is consistent with itself.  His administration of the trust was honorable to him as a man of business and a faithful fulfillment of its sacred obligations; and in my own view, his testimony is worthy of full credit for honesty of intention and for as great accuracy as can usually be given to events which transpired so many years ago.

When Solicitor Montgomery made known to his client the impressions he had derived from Mr. Davis, that Vincent expected some inducement to "keep him on the right track" in his testimony, and he thought $1,000 was that inducement, his client stated to him that he had given Vincent $300, and could not afford to give more ; instead of discussing the comparative criminality of the offense of bribery, whether the sum was more or less, it was his imperative duty to have denounced such conduct.  It was not an occasion to be jocular, or for a counsellor of the Court to indulge in trifling remarks upon this the most serious of all subjects connected with proceedings in a Court of Justice.  It is, indeed, trifling with serious things.  It is the duty of counsel to aid in the investigation of a suit, and to keep the sources of information free from corruption, and the Court cannot for a moment entertain a discussion of the morality of giving a consideration to a witness, to induce him to tell the truth.  It is corruption itself; and the man who would receive money to tell the truth, would receive money to tell a falsehood, and there could be no reliance upon his testimony in either case.  Mr. Montgomery has always sustained an honorable position at the bar, and the Court do not believe that he would seri-

ously entertain, or advise a client to entertain, a proposition of this character. The honor of the bar must be sustained by an upright practice, or the course of legal investigation will be liable to be impure, and dangerous to the rights of parties. Should a case be made out of a violation of this principle, it would be the imperative duty of the Court to strike the name of the offender from the roll. The evidence of the counsel for respondent is not material, any further than it bears on the testimony of Mr. Davis. Even had he made different statements of the conversation with Vincent, he sustained Vincent in Court, under oath. The statement out of Court should not have weight against his statement under oath, so far as it conflicts with Vincent. It would cast a shade over his own testimony, but would not in the least affect Mr. Vincent, although, as I said before, I do not perceive any such discrepancies as would invalidate the testimony of either. The difference arose from a misinterpretation of the extent and force of his remarks. But on this account the testimony of Mr. Vincent should not be weakened. When a witness has stated what another witness has said, and in Court, under oath, gives a denial to such statement, or a different version of it, it should be received with very little credit, and it cannot affect unfavorably the testimony of the other. In view of the testimony given by all the counsel, the Court is unable to perceive that it lessens in any degree the weight to which the testimony of Mr. Vincent is legitimately entitled. His credibility is in no degree impaired by it. Much of this testimony would have been excluded, had exceptions been taken to it; but it was admitted in conformity with the wishes of counsel of respondent, and in the case of Mr. Davis of the respondent himself.

The respondent was invited to visit this country, and he arrived here in 1855, in the 22d year of his age; and it appears by his answer that he had been educated in the art of shipbuilding, as well as having general business qualifications, and with sufficient means at his command to establish himself independently of complainant's patronage. It is in evidence that on his arrival, the complainant furnished him with the necessary clothing proper for the climate; and it is alleged in the bill, and not denied, that the complainant paid the respondent's

passage from England. There is no evidence that he had any means to establish himself in the business of a shipwright.

Respondent states in his answer that he does not know what consideration Vincent paid for said property, but believes it to have been $8,000, as stated in the deed, and that said sum was *bona fide* paid by said Vincent to, and received by, the complainant, in consideration of the sale of the Puuloa estate by the said Vincent to complainant.

He further says that he does not know whether the deed from Vincent to him was executed at the request of complainant.

It is very clear that on his arrival, the respondent regarded Puuloa as complainant's estate ; and Vincent testifies that "for some year and a half he had often expressed the wish to reconvey the estate to complainant, but the title remained in him till the arrival of respondent ; " and Isaac then said to him, after introducing his brother, "I will now take the deed of the land, and in preparing the deed, insert my brother's name in place of my own. He had no negotiation with the respondent about the estate." It appears, under his own hand, that he regarded the Puuloa estate as his brother's, on his arrival ; and is it in the nature of things, that the respondent, coming here at the invitation of his brother, and at his expense, and immediately entering in aid of his brother on the management of the estate, that he did not know something of the nature of his brother's interest? If he regarded Vincent as the owner in fact, he must have been struck with the singularity of the interview as detailed by Vincent. It was a very summary mode of negotiation, certainly. On the hypothesis that Vincent was the owner, and he was the purchaser, and especially when he found that he could make the purchase on six, twelve and eighteen months, without an advance payment. It is not an ordinary event that a stranger, on the first introduction, can purchase a large and productive estate on time, without a money payment. The weight of evidence is that the respondent arrived here without means, and 'did he expect to produce from the estate the amount of purchase money to meet the payments as they became due ; if so, it would seem that Vincent sold the estate for what it would produce in six, twelve and eighteen months, and if it was not an extraordinary estate, in its productions, paying largely be-

yond expenses, it does not appear how the respondent was to make his payments, which excited no solicitude on the part of Vincent. On the arrival of the respondent, the complainant was managing the estate, without interference from Vincent, and had been for a year and a half.

In view of the history of the whole transaction, and more especially when we take into consideration the relationship of the parties, can there be a doubt that the respondent had been informed, and knew, that the estate belonged to the complainant, and that Vincent was ready to convey it on request?

The respondent further answers that he believes the furniture was the property of Vincent, because the complainant never made any claim for it. Vincent testifies that he never owned the furniture, and there is not a doubt, from the evidence, that it was purchased by the complainant. If the respondent regarded the furniture as Vincent's, it is somewhat singular that he could have used it for more than six years, for it is in evidence that it was valuable, without being informed of the incorrectness of the opinion. It appears that for years the parties were not on good terms, and, therefore, for reasons of friendship, he could not have believed that Vincent left the furniture for his use for this long period. It must have appeared to the respondent as exhibiting the same spirit of generous accommodation as the original transaction of the sale of the estate to him.

In examining the deed, as detailed in the bill, it appears that the habendum is in these words : " To have and to hold the above described property unto the said Daniel Montgomery, his heirs and assigns, forever, in like manner as I myself now hold the same, and subject to all mortgages, liens and encumbrances now existing on said estate, whether the same may have been created by myself or by any other person." If the respondent regarded Vincent as the owner, and his business in obtaining this conveyance was with him, and him alone, why did he not ask him to give him a short list of the mortgages, liens and other encumbrances on the estate. There was no conversation about the title or the encumbrances he had imposed upon it, and yet he gives his notes and mortgages for $15,000 for a quit-claim deed, with the addition of this unusual

provision, that he was to hold it in like manner as Vincent held it.

It appears he enters upon the management of the estate, and finds thereon a quantity of goods for trade, which he devotes to the use of the business, for some of which the complainant paid for after the respondent arrived; and it is also proved that he purchased goods and lumber afterwards, which he paid for, and which were used for the benefit of the business on the estate: He conducted the business so far as using the property on the estate, the same as if all the property, personal and real, was his own, or as if he was managing the business for the owner, while it does not appear from his answer that he had any title to any of the personal property, excepting what he acquired by virtue of an auction sale of some cattle, amounting to $145. It appears from the answer that the complainant directed the sale, and that he purchased them for that sum. If he was acting as trustee, the purchase would, of course, be for the benefit of the principal.

It appears, further, that some months ago the respondent called upon Vincent, for the conveyance of the schooner which Vincent purchased for the benefit of the estate, and he says he conveyed it, supposing it was the same thing whether he conveyed it to the respondent or complainant; that he was paid for the advances he had made on the schooner, when he had the management of the estate, by complainant. This is another piece of property belonging to the complainant, which for years had been devoted to the use of the estate, in the same manner as if it had been conducted for the benefit of complainant, and for which it is not pretended by the respondent that he had ever purchased; so that, in a word, the case presents itself in this way: Vincent holds in trust, for complainant, the estate at Puuloa, and which complainant had personally conducted for some year and a half, and he was desirous of reconveying the same, that he might be relieved from the responsibility of the trust. The complainant communicates with his brother, the respondent, in England, desiring him to come to this country, and pays his passage here, and his expenses after his arrival; takes him into the confidential relationship which his kindred blood naturally inspired, and desirous of keeping

Isaac Montgomery *vs.* Daniel Montgomery.

the estate in the same legal condition as before, and to enable his brother to have what he regarded as a profitable business, called on his trustee, Mr. Vincent, introducing his brother, and requests him to convey the Puuloa estate to him. He makes the conveyance, as has been already detailed, without any negotiation on the part of the respondent, takes the notes for $15,000, and mortgage, and he says he delivered them to complainant. Soon after, the complainant became involved, and was confined in prison from October of the same year, for the period of twelve months. It is reasonable to suppose that from the declarations of the respondent, as well as from the relationship of the parties, and the circumstances which subsequently developed themselves, that those notes and mortgage were among the papers of the complainant which were passed into the hands of the respondent. He then enters on the estate, and not only the real, but all the personal property, he reduces to possession, and I have no doubt rightfully, and in accordance with the understanding with his brother. He converts all the goods for the benefit of the business. He keeps no account of sales with his brother of the goods, the receipts being devoted to the business ; all the stock on the estate is devoted to the same purpose. The vessel also, which is valued at $2,000, is devoted to the use of the estate ; the furniture is put in use, and no contract for the sale or purchase appears, and no credits given complainant or Vincent ; and yet he says he supposed the furniture was Vincent's. If this is true, it is singular that he should use it for years without any call from Vincent for an account of it, and more especially as he had in the meantime recovered a heavy judgment against him. He makes advances to his brother, but of small amount in comparison to the sum due on the notes. There is no evidence of any effort to have these amounts applied on the notes by the respondent, nor demand of complainant for payment. The notes and mortgage are not assigned by Vincent, and the mortgage is not recorded, and they are regarded, as far as the acts of the parties are concerned, as a nullity, as a mere matter of form. The complainant has certainly treated them so, not securing them by assignment or by record, or enforcing payment as an assignee in equity. The respondent, in his conduct, has regarded those obligations with the same indifference. Regarding, as I do, that the con-

veyance by Vincent to respondent was intended by the parties to this suit, to place respondent in the same relationship of trust as Vincent stood to complainant, or as his deed expresses —"To have and to hold the estate in like manner as I myself now hold the same."

The whole conduct of the respondent in reducing all the property to possession, necessary to carry on the estate, is perfectly in accordance with the spirit of the trust and the relationship of the parties. It can be explained upon no other hypothesis. than that the trust to Vincent was continued in respondent. In the case of the Methodist Episcopal Church *vs.* Jacques, 1 Johns. Ch. Rep., 450, the Court declared that lands purchased held by the husband, with moneys of the wife, are deemed to be in trust for her, though purchased in his own name, and a third person, to whom the husband had conveyed an estate so purchased, with notice of the manner of acquiring it, was held to be chargeable with the trust. This was a case where there had been a marriage settlement. So in the case of Murray *et al.*, Ballou *et al.*, 1 Id., 566, the Court say : That if a purchaser has notice of a trust at the time of purchase, he himself becomes trustee, notwithstanding the consideration he has paid. If the *cestui que trust* resumes the estate, and, as in this case, directs to whom the conveyance shall be made, and if made without consideration, as it is contended it was made in this case, a resulting trust arises. Furthermore, if there was a sale, and notes and mortgage taken in full consideration, how is it that the respondent could testify as he did in the Police Court, that he did not think that his brother had any interest in an inch of land, or any interest in any outstanding notes, when by his own showing, although his books are very unsatisfactory, his payments to his brother were—

| | |
|---|---:|
| From June 20, 1855, to June 14, 1856, | $ 836 00 |
| Less property sold, | 547 38 |
| | $ 288 62 |
| From June 14, 1856, to July 18, 1857, | 1,367 00 |
| From July 18, 1857, to July 17, 1858, | 226 00 |
| From July 17, 1858, to August 1, 1859, | 534 00 |
| From August 1, 1859, to close of the books, | 826 80 |
| From 31st January, 1861, to Sept. 10, 1861, | 1,014 55 |
| | $4,256 17 |

So that according to this account, rendered by the respondent, he had paid the complainant during the last seven years $4,256 17. If the notes and mortgage were given, and the estate was not held in trust, the amount due on the notes for interest would be more than he has paid by over $8,000, which, added to $15,000, the principal, makes about $23,000 due ; besides the amount due for all the personal property converted to his use. If the complainant could have made oath to the truth of the statement, why should he not have done so, and foreclosed on the estate. And another equally pertinent inquiry is, in view of this state of facts, as deduced from his books, and his own statement that the notes and mortgage were in the possession of complainant in 1861, how can he reconcile it with his testimony in the Police Court, that he did not think that his brother had any interest in any land, or outstanding notes ? If he did not hold in trust why did he not seek to have endorsements made on the notes as he made payments ?

It is contended further on the part of the respondent that the allegation in the bill that the sum of $8,000, acknowledged to have been received in the deed of the estates from complainant to Vincent is expressly denied by Vincent, and that the evidence does not sustain the charge. It appears that in 1848, when the complainant held the estate under lease, that he borrowed $5,000 on an assignment of the lease and the salt on the estate, and that in 1849 complainant made the purchase and increased the debt of Mr. Vincent to $8,000, which he took, as the understanding was to secure that amount. It is very true that it was not paid in payment of the purchase of the estate ; but it was received, and for which an incumbrance on the estate was created. It is a partial mode of stating the case ; at the same time I do not regard it a false statement in intent. The counsel further contends that the averment in the bill that two-thirds of the profits of the business of the estate were to enure to complainant, and one-third to Vincent, conflict with the evidence, which is, that one-third was to go to his wife. The legal right was in complainant, and not in his wife, and Vincent might have understood from complainant that he desired a third of the profits paid to her, still it does not appear that she had any legal claim ; for he swears that the estate was held in trust for

complainant, and not for complainant and his wife, and the advances were not made in accordance with this view. It cannot be regarded as a material conflict in the evidence.

Vincent testifies that the money, amounting to $5,000, raised on mortgage from Angel was equally divided between himself and complainant ; and that he gave at request of complainant a note to respondent for the amount which he received and the interest. This statement the respondent denies, and says the note was given for some other consideration, but produces no proof of it. There were other matters of business between complainant and Vincent, but evidence of various books prove the mode in which other indebtedness was paid. The weight of evidence is decidedly in favor of Vincent's statement ; certain it is that the consideration arose from indebtedness to complainant and not to respondent ; the respondent having recovered judgment on the same in 1856, which remains unsatisfied to this day.

It is contended further that it is not probable that if a proposition of settlement had come from complainant, that respondent's counsel would have advised him not to accede to it.

The respondent avers in his answer a denial of the allegation in the bill that complainant has made any efforts to obtain a settlement with the respondent in relation to the Puuloa estate or the business connected therewith, or alleged or pretended any right to a settlement in relation thereto. Mr. John Montgomery testifies in relation to a compromise between the parties, and that the respondent on the morning after informed him that he had agreed to his brother's demand to pay him $10,500 to resign his claims to Puuloa, to be in installments in seven years, with interest. These terms of settlement were defeated in consequence of the complainant desiring to have a certain piece of land of the estate, but which the respondent objected to, on account of its being occupied by natives who were troublesome to him.

It further appears that the complainant, by his counsel, addressed a letter to respondent, proposing an arbitration, to which his counsel replied, asking to be apprised of the nature of the claim ; to which the counsel of complainant replied, setting forth the basis of his claim, and expressing a willingness

Isaac Montgomery *vs.* Daniel Montgomery.

to settle amicably and on liberal terms ; to which the respondent replied, and proposed a settlement by paying $10,500, payable in seven years, secured on the estate, and on condition that complainant should leave the estate. This proposition was declined. It is incomprehensible to me how such an answer could have been filed, when the respondent negotiated with the complainant in person, and when his counsel for him replied to the letter of the complainant, proposing an arbitration, or some other mode of settlement, on amicable and liberal terms.

It is contended further, that the agreement, as alleged in the bill, was unreasonable, inasmuch as that if the estate turned out unprofitable, the respondent had made a slave of himself, as by its terms as set forth, he had bound himself to pay $100 per month forever, receiving one-third of the profits. I do not regard that the trust is fixed in time. The condition itself is not uncommon. Men are constantly making contracts to pay a certain sum per annum for the use of property, taking the risk of the income. But there certainly can be no pretense for continuing the trust against the wishes of the trustee. There was no time specified of its continuance, and it was perfectly competent for him to surrender the trust at any time he pleased; but as long as it did continue, the bill alleges certain payments should be made to the complainant monthly, from his portion of the profits, and that the trustee should have for the management of the estate one-third of the profits, as Mr. Vincent had. I am not satisfied that this was the understanding, from the history of the management of the estate by respondent, and there is no sufficient proof of this allegation in the bill, unsustained by the circumstances. When this relationship in business began, it undoubtedly was with the true feelings of brothers. While the complainant surrendered to respondent the use and benefit of everything on the estate, such as the goods, lumber, furniture, stock, etc., etc., without exacting any account, and while the respondent used all this property for the common object, without giving any credit or proposing to render any account, at the same time the respondent was making what he regarded as improvements, and which were doubtless expensive, and so far as appears, without objection from the

*cestui que trust,* who was living on the estate most of the time. It is much to be regretted that the terms upon which this business was to be carried on were not clearly defined. It began in the generous feelings of brotherhood, and was carried on without regard to accountability and has terminated in a disagreement.

It should be a warning to all in business relations. The terms and conditions should be clearly understood and defined.

The answer of the respondent is not only materially shaken by the evidence and the circumstances as developed in the course of the investigation, but his oath loses its force and confidence by his application to Vincent to testify in conformity to certain instructions, as detailed in Vincent's testimony, for the consideration of $1,000. The testimony of Messrs. Montgomery and Davis to his own declarations that he had advanced money to Vincent, which Mr. Vincent positively denies, tends to increase the want of confidence in his statements.

I have examined this somewhat complicated case with great care, and upon the best examination I am able to give the law and evidence, my judgment is that the complainant is entitled to a decree declaring him in equity entitled to a conveyance of the Puuloa estate from the respondent, and that an account should be taken of his administration of the estate on the basis of a salary, for services per annum, charging him for the receipts of money for personal use ; for it is certainly very clear that the complainant has been conversant with the general management of the estate, of the buildings erected, and of the improvements made, and there is no evidence that he has made any objection ; therefore, upon principles of law and equity he is bound by all that has been done by his trustee, with the sole condition that the trust has in all these particulars been faithfully executed.

At present there must be an interlocutory decree, that reference be made to the Clerk of the Court, *ex officio* Master in Chancery, to state an account of all the moneys received from the trust estate by the respondent, and also all moneys expended thereon by him from June 19th, 1855, to the day of filing of this bill, and particularly an account of all moneys received by the respondent for his personal use, giving him credit for his

services for the period aforesaid, with the usual powers given to the Master on such occasions, to examine either party and to require the production of all books and all documents and vouchers in the possession of either party, touching the subject matter of the trust estate.

C. C. Harris, for complainant.

A. B. Bates, for defendant.