D. W. KANOELEHUA *vs.* A. J. CARTWRIGHT, Trustee of the Estate of EMMA KALELEONALANI.

APPEAL FROM DECREE OF JUDD, C.J.

JULY TERM, 1888.

JUDD, C.J., McCULLY, PRESTON, BICKERTON and DOLE, JJ.

Previous to the enactment of "An Act relating to the property and rights of married women," (Laws of 1888, Chapter XI.), money accruing and paid to a wife vested immediately in her husband without his reducing it to possession.

A conveyance to one person for a consideration paid by another person ordinarily creates a trust in the grantee in favor of the one furnishing the consideration.

OPINION OF THE COURT, BY DOLE, J.

The following decision was rendered in this cause by the Chief Justice at Chambers:

DECISION OF JUDD, C.J., APPEALED FROM.

This is a bill in equity to declare and enforce a resulting trust.

The facts of this case are concisely stated as follows: One Pahau, wife of plaintiff, received in 1881 and 1882 some six thousand dollars as her distributive share of the estate of the

late C. Kanaina, as one of his heirs, the same being proceeds of real estate. This money was placed by her in Mr. A. J. Cartwright's hands, and it was paid out by him on her orders from time to time. The plaintiff and his wife, Pahau, had not been living together for many years, but in the long and expensive litigation which Pahau engaged in to determine her rights in the estate of Kanaina, she was obliged to use her husband's name, and he readily gave her his co-operation in procuring witnesses, and assisted in every way in the litigation, but I think it is well established that, though there was the appearance of reconciliation between them, they each continued the illicit relations with the paramours they had taken up with during the long separation. There is some evidence that plaintiff and his wife jointly signed the orders on the fund in Mr. Cartwright's hands. This is denied by Mr. Cartwright, but he does not produce the orders, and thinks he delivered them up to Pahau when he closed his accounts with her. I am of opinion that the plaintiff had not reduced this fund to his possession, and that it retained the character of real estate of his wife. The bill, moreover, alleges that it was plaintiff's wife's property.

After the death of Mr. Kanaina, in 1877, Pahau, who had been one of his retainers, transferred her allegiance to Queen Dowager Emma. Mr. Cartwright was the Queen's agent and business manager and this accounts for Pahau's putting her funds in his hands.

In 1881 and 1882 two parcels of land in Kauluwela, Honolulu, were purchased, one for $550, and another for $1550, and paid for out of this fund in Mr. Cartwright's hands, and afterwards houses were erected upon them at Pahau's expense, and both she and plaintiff and several other retainers of Queen Emma's moved thither. Pahau lived there until her death, in 1886, and plaintiff continued there until ejected by process of law a few months ago. In both of the conveyances of the lands in question, Queen Emma is the grantee, and the name of plaintiff or Pahau nowhere appears in them.

Mr. Cecil Brown testifies that he drew the conveyance for the second piece purchased, (the consideration for which was $1550), that Pahau told him to make the deed in the Queen's name. Upon Mr. Brown's asking her why she wished it so done, she said the money came from Kanaina's estate; that her husband, Kanoelehua, had deserted her and she wished the property so fixed that he should have nothing to do with it; that she had an understanding with the Queen that she (Pahau) was to live on the land and to take the rents, and that she would trust the Queen's word, although no life estate was reserved to herself in the deeds. Other witnesses say that Pahau wished the land put in the Queen's name lest Kanoelehua should mortgage the land, and she (Pahau) eventually lose it. Miss Lucy Peabody, an attendant of the Queen, who negotiated the first purchase for $550, says Pahau directed the conveyance to be in the Queen's name so that her (Pahau's) husband should have nothing to do with it. I think that all allegations of feebleness of intellect and ignorance on the part of Pahau, and charges of fraudulent advantage taken of this by respondent, are not sustained.

I find it to be established that plaintiff knew of the disposition of this property at the date of the deeds or soon after.

The question of law remains. Do these facts show that a trust has resulted in favor of plaintiff?

The law as laid down in Perry on Trusts, Vol. 1, Sec. 126, was adopted by this Court in *Olepau et al. vs. Rahapa et al.*, October Term, 1887: "Where upon a purchase of property, the conveyance of the legal title is taken in the name of one person, while the consideration is given or paid by another, the parties being strangers to each other, a resulting trust immediately arises from the transaction and the person named in the conveyance will be a trustee for the party from whom the consideration proceeds." This rule has its "foundation in the natural presumption, in the absence of all rebutting circumstances, that he who supplies the purchase-money intends the purchase to be for his own benefit, and not for another, and that the conveyance in the name of another is a matter of convenience and arrangement between them for collateral purposes." *Ante*, page 177.

In 2 Story, Sec., 1202, the author says, "Where a man buys land in the name of another and pays the consideration money, the land will generally be held by the grantee in trust for the person who so pays the consideration money. This as an established doctrine is now not open to controversy."

Bispham says, Sec., 80, "the reason of this doctrine is, that the man who pays the purchase-money is supposed to become, or to intend to become, the owner of the property, and the beneficial title follows that supposed intention." Adams' Equity, Section 33, says, "Resulting trusts, where the intention to sever the legal and equitable ownership is apparent from the attendant circumstances, occur where the estate has been purchased in the name of one person and the purchase-money or consideration has proceeded from another. In this case the presumption of law is, that the party paying for the estate intended it for his own benefit and that the nominal purchaser is a mere trustee."

But it is contended that "as a resulting trust may be shown by parol proof, as a presumption of law arising out of the transaction, so the presumption may be rebutted by parol proof, showing that no trust was intended by the parties and that it was the intention to confer the beneficial interest upon the supposed nominal purchaser," 1 Perry, Section 139. The same Section reads further, "As the resulting trust is a mere matter of equitable presumption it may be rebutted by facts that negative the presumption; and whatever facts appear tending to prove that it was intended that the nominal purchaser should take the beneficial interest as well as the legal title, negatives the presumption."

It must also be borne in mind that "the presumption is in favor of the trust resulting to the party paying the consideration, and the burden of proof is upon the mere nominal purchaser to show that he was intended to have some beneficial interest." *Id.*

Although there is evidence that Queen Emma contributed to the support of Pahau, from the time of Kanaina's death until she received her share of his estate, one witness testifying to the

sum of $40 per month, there is no explicit evidence that this support was the reason why the deed was put in Queen Emma's name and was to stand as its consideration.

On the contrary, Mr. Brown and Miss Peabody, the only witnesses who testify as to Pahau's declarations made at the time the deeds were made, say that the reason that Queen Emma's name was placed in the deeds was in order that Pahau's husband might have nothing to do with the land.

The contribution by a chief of these islands towards the support of a retainer is nothing unusual, and the Queen might well have supported Pahau without the expectation of receiving the conveyance of this land.

It is not claimed by the respondent that this purchase and conveyance were intended to be an "advancement" to Queen Emma. The presumption of an advancement arises when "the purchaser takes the conveyance in the name of a wife, child or other person for whom he is under some natural, moral or legal obligation to provide." Perry, Section 148.

There was no such obligation on the part of Pahau. She was not bound to provide for Queen Emma. On the contrary, the obligation, if any, was on the part of the Queen to provide for her retainer.

I am aware of the feeling of obligation entertained by some of the old Hawaiians to leave their property to their Aliis, but this is a purely voluntary consequence of loyal respect and fealty, and is not an obligation that the courts could recognize as binding, or one that should be favored as against heirs at law.

To my mind these circumstances do not rebut the presumption that Pahau intended the Queen to be her trustee.

The fact that the nominal purchaser (Queen Emma) is dead does not affect the admissibility of parol testimony to show the resulting trust. Perry, Section 138.

Nor does the fact that Pahau is dead affect the right of her heir at law to bring this bill. Although the collateral purpose for which the conveyances were made was to prevent the exercise by the present plaintiff, as Pahau's husband, of his marital

rights over this property, and this purpose would apparently be defeated by finding that the trust resulted in favor of Pahau, this husband being now her heir-at-law; Pahau's intention was that she, and not Queen Emma, having advanced the purchase-money, was to be benefited by the transaction, and the incident that on her death her husband is her sole heir, is one that the respondent, representing Queen Emma's estate, cannot take advantage of.

Upon the whole case I find that a trust has resulted in favor of Pahau, and the plaintiff as an heir may have the relief prayed for.

Decree accordingly.

### By the Court.

The learned Justice makes the following findings at the end of the first paragraph of his decision, *i.e.* "I am of opinion that the plaintiff had not reduced this fund to his possession, and that it retained the character of real estate of his wife. The bill, moreover, alleges that it was plaintiff's wife's property."

We do not support this conclusion, but find that the sale of the lands of the Kanaina estate, and the partition of the money proceeds under the order of the Court and in accordance with the statute of partition, was a conversion of the real into personal property (*Bartlett vs. Janeway*, 4 Sandford Ch., 396), and that as soon as the wife's claim against the Kanaina estate was paid in money, it vested in the husband without the necessity of his reducing it to possession. (*Reimenschneider, Administrator, vs. Kalaehao*, 5 Hawn., 550.)

This view is an additional ground for the decree at chambers, for we support the decision appealed from in all other particulars.

The appeal is dismissed.

*W. C. Achi*, for plaintiff.

*W. A Kinney*, for defendant.