# JULIUS WERY AND EMILY WERY HUDSON *v.* PACIFIC TRUST COMPANY, LIMITED, EXECUTOR UNDER THE WILL AND OF THE ESTATE OF EMIL WERY, DECEASED, ET AL.

## No. 2159.

ARGUED DECEMBER 10, 1935.  DECIDED FEBRUARY 25, 1936.

COKE, C. J., PETERS, J., AND CIRCUIT JUDGE CASE IN PLACE OF BANKS, J., UNABLE TO ATTEND ON ACCOUNT OF ILLNESS.

OPINION OF THE COURT BY PETERS, J.

Emil Wery died testate in Honolulu June 7, 1930, at the age of seventy-seven years, seized and possessed of considerable real and personal property subsequently appraised in the proceedings upon probate of his will at fifty-four thousand odd dollars. The deceased was survived by his widow and three children, the latter the issue by a former wife named Hattie who died in July, 1916. The will of the deceased consisting of an original will and codicil thereto dated February 14, 1925, and October 9, 1928, respectively, having been admitted to probate, two of the surviving children filed a bill in equity to declare a trust of the property composing the estate of the testator for the benefit of the surviving children. The lower court granted the relief prayed.

Appellants' assignments of error are mainly directed to the findings of fact and conclusions of law of the trial judge involving the ultimate issues. Two of the assignments present for review the admission of evidence. Neither in our opinion affects the ultimate results and will not be considered except to the extent that one raises a

question of professional ethics which the court feels, in justice to the attorney involved, should be determined.

E. R. McGhee, Esquire, an attorney of this court appeared as a witness on behalf of complainants and testified over objection of appellants to certain alleged prior contradictory statements made to him by William Wery one of the respondents who appeared as a witness on behalf of himself and his corespondents. This the appellants assigned as error upon the grounds: (1) That such statements were privileged, the relation of attorney and client having at the time the statements were made existed between Mr. McGhee and William Wery and (2) that such statements were elicited by Mr. McGhee in response to questions propounded by him to William Wery at a time when Mr. McGhee was the attorney for Emily Wery Hudson one of the complainants in this case and William Wery was one of the respondents and represented by counsel other than Mr. McGhee, contrary to the canons of ethics of the American Bar Association. The second ground of error does not present any legal objection to the admission of the evidence and will not be considered.

The evidence in this case supports the following findings: That though not her attorney of record Mr. McGhee was acting as the attorney for Mrs. Emily Wery Hudson in the instant case; that although not the attorney of record Mr. McGhee was also acting as the attorney for Mrs. Hudson and William Wery, her brother, in the matter of the application of Mrs. Hudson to register the title of certain lands in Hilo pending before the land court at the time of the trial of the instant case; that Mr. McGhee was never employed by William Wery in any matter directly or indirectly connected with the instant case and that the alleged prior contradictory statements were made by Mr. Wery upon the occasion of his consulta-

tion with Mr. McGhee in connection with said application for registration of title.

Under the findings the statements made by Mr. Wery to Mr. McGhee were not privileged. It is true they were made by a client to his attorney but they had reference not to the subject matter of the attorney's employment but to matters outside of the scope of that employment in reference to which the relation of attorney and client did not exist. Where the details of professional employment and the various steps necessary to its performance are not limited by the client in any way and the conduct of the business and the means of its accomplishment are committed to the attorney's discretion the scope of an attorney's employment is extremely broad and includes not alone such authority as it expressly conferred but all such authority as may be implied as flowing therefrom. *Anderson* v. *Rawley Co.*, 27 Haw. 60, 63. But it cannot be said that the scope of Mr. McGhee's employment in the land registration matter included the representation of William Wery in the instant case. Especially is this so, Mrs. Hudson and her brother Mr. Wery being opposing parties in the instant case and Mr. Wery represented by other counsel. To be privileged the communications of a client to his attorney must be in relation to matters within the scope of the attorney's employment. *Moyers* v. *Fogarty*, 119 N. W. (Ia.) 159; *Denunzio's Receiver* v. *Scholtz*, 77 S. W. (Ky.) 715, 716.

The merits. It is the contention of the petitioners-appellees, hereinafter referred to as appellees, that the property of which the testator died seized and possessed had its source in a lease to him taken in his name from the Bishop of the Catholic Church in Hawaii dated June 1, 1895, which the testator acquired on behalf of his wife Hattie with money belonging to her whereby a "resulting" trust in said lease was created, whereof the testator

was the trustee and his wife Hattie was the beneficiary; that said property represented the rents, issues and profits of said lease augmented and increased by the investment and reinvestment of the same; that the testator declared to his wife Hattie and after her death to their children and by his conduct and otherwise recognized that he held the said lease and the net rents, issues and profits thereof and the property into which, for the time being, said rents, etc., had been converted by investment and reinvestment first for her benefit and after her death for their benefit whereby an "express and constructive" trust was created, whereof the testator and after his death his legal representatives were successive trustees and his said wife Hattie during her lifetime and after her death their children were successive beneficiaries subject upon the death of Hattie to his statutory right of curtesy.

The question crucial to the determination of the issues herein is whether a resulting trust was created in the estate for years granted on June 1, 1895, by the lease from the Bishop of the Catholic Church in Hawaii to the testator as lessee for the benefit of his wife Hattie. If no resulting trust for the benefit of the mother of appellees were created in the estate thus demised then the claim of the appellees that the property composing the estate of the testator was but the accumulations of the investment and reinvestment of the net issues and profits of said lease, falls, except as the evidence may sustain the voluntary declaration by the testator of a trust of all his property, first for the benefit of his wife and after her death for the benefit of their children.

Sufficient has been said upon the law of resulting trusts by this court and by single justices sitting alone in equity to obviate the necessity of any extended discussion of the subject. See *Montgomery* v. *Montgomery*, 2 Haw. 563; *Jarrett* v. *Manini*, 2 Haw. 667; *Keawe* v. *Parker*, 6

Haw. 489; *Olepau* v. *Rahapa*, 7 Haw. 175; *Kanoelehua* v. *Cartwright*, 7 Haw. 327; *Lazarus* v. *Lazarus*, 12 Haw. 369; *Kuwahara* v. *Kuwahara*, 23 Haw. 273. It remains alone to emphasize by repetition two of the essential elements of a purchase-money resulting trust material to the issues, namely: (1) Payment of the purchase price of the property purchased by the alleged beneficiary; (2) Transfer of the property by the vendor to another person at the direction of the alleged beneficiary.

Before an alleged resulting trust will be enforced in equity the evidence establishing its creation must be clear and convincing. Restatement of the Law of Trusts, § 458. As expressed by this court, evidence that is: Of that "most conclusive character," *Jarrett* v. *Manini, supra*, p. 673; "full, clear and satisfactory," *Lazarus* v. *Lazarus, supra*, p. 372; *Montgomery* v. *Montgomery, supra*, p. 569; "clear, cogent and convincing," *Jones* v. *Jones*, 30 Haw. 565, 569. The term "clear and convincing" may be considered as synonymous with a summation of the terms quoted. The reasons for the requirement of this degree of proof are obvious. "The courts are suspicious of resulting trusts of the purchase-money type, regard them as possible instruments for depriving a person of his property by fraud and perjury, and therefore require one who claims the benefit of such a trust to prove his case by 'clear and convincing' evidence." 2 Bogert, Trusts, § 452, p. 1351. The following language of Chancellor Kent is pertinent: "The cases uniformly show, that the courts have been deeply impressed with the danger of this kind of proof, as tending to perjury and the insecurity of paper title * * *." *Boyd* v. *M'Lean*, 1 Johns. Ch. (N. Y.) 582, 590. See *Nashville Trust Co.* v. *Lannom's Heirs*, 36 S. W. (Tenn.) 977, 979. Moreover the burden of proof rests upon him who asserts the creation of a resulting trust. Hence it is that it was incumbent upon the appellees to

prove by clear and convincing evidence that a trust was created in the lease from the Bishop of the Catholic Church in Hawaii for the benefit of their mother resulting from: (1) Payment of the consideration for or purchase price of the lease from the Bishop of the Catholic Church in Hawaii to the testator by Hattie Wery; (2) Demise by the lessor to the testator at the direction of Hattie Wery. In this, in our opinion, the appellees have absolutely failed.

First as to any purchase price being involved in the acquisition of the lease of June 1, 1895, or its successor the lease of June 15, 1897. The sole source of information of the facts and circumstances surrounding the acquisition by the testator of the lease of June 1, 1895, is the transcript of evidence taken in narrative form upon the trial and the decree of the trial court in an action in equity for specific performance in which one Vierra was the complainant and Gulstan F. Ropert, Bishop of Panopolis, and the testator were respondents, reported on appeal to this court in 10 Haw. 294; 343. All the parties referred to in the evidence in that case are long since dead. None of the pleadings in that case nor the exhibits referred to in the transcript are extant, with but one exception. The lease of June 1, 1895, to the testator though admitted in evidence in that case is among the missing exhibits and was not produced upon the trial of this case. From the information available it appears that Vierra, the complainant in that case, was the lessee of the Roman Catholic mission, of the same premises subsequently leased to the testator under written lease which expired May 31, 1895; that the lease to the testator of June 1, 1895, was of the same premises from his corespondent, Bishop Ropert, and that the purpose of the suit was the specific performance of an agreement to execute a new lease to Vierra at the expiration of the lease held by him at an increased

rental for an additional term of twelve years beginning
June 1, 1895. The final disposition of the *Vierra* case in
this court was upon a motion for a rehearing denied June
9, 1896, and allowing for the time of remittitur and the
exercise by Vierra of the thirty-day privilege granted him
by the decree of the trial court to remove improvements
placed by him on the premises it is reasonable to assume
that if the testator had not secured complete possession
of the premises pending the litigation, he at least secured
possession by September 1, 1896. For some unaccount-
able reason however, the cause or purpose of which we are
not advised and the circumstances of the execution of
which do not appear, a new lease was executed by Gulstan
F. Ropert in his representative capacity as Bishop of the
Catholic Church in Hawaii to the testator on June 15,
1897. This lease was placed of record on June 20, of the
same year. The later lease apparently was of the same
premises as those of the lease of June 1, 1895, at the same
rental but whereas the term demised by the earlier lease
was for the same term claimed by Vierra the later was
for a period of thirty years from the first day of October,
1897. It no doubt was a copy of its predecessor except
as to the term demised and was substituted by the parties
thereto in lieu thereof. Its physical substitution for the
lease of June 1, 1895, may be assumed from its appear-
ance. It is enclosed in a legal back in which the name
of the bishop is substituted for the Rt. Rd. C. Matthais,
one of the local priests involved in the negotiations with
the testator which resulted in the lease to the latter and
the date July 15, 1897, superimposed upon the date June
1, 1895. If, as we believe, the lease of July 15, 1897, was
a substitute for that of June 1, 1895, the former was ob-
viously subject to any pre-existing trust affecting the lat-
ter.

There is no claim that there was any consideration expressed in the lease of June 1, 1895, from the lessee to the lessor other than the conditions and covenants therein expressed on the part of the lessee to be kept and performed including the covenant to pay rent in monthly installments during the term demised. No claim is made that moneys belonging to Hattie Wery were used for the payment of the rent respectively reserved by the lease of June 1, 1895, or by its successor, the lease of June 15, 1897, except as it might be said that all moneys accruing as rent under subleases were the moneys of Hattie Wery under the trust claimed by appellees and were used in part to pay the rent reserved under both leases. The appellees, however, claim there was a consideration though not expressed for the execution of the earlier lease or of the later lease by way of a contribution to a trip to Europe made by the bishop, upon which he departed from Hawaii in April, 1895, and adopt the assumption of the trial court that the testator as a party respondent in the *Vierra* suit must have been compelled to incur expenses by way of attorneys' fees and otherwise to defend that suit.

Assuming arguendo that a contribution to a European trip and expenses of litigation collectively or separately may legally constitute a consideration for or the purchase price of a lease, the subject of a resulting trust, the evidence falls far short of being clear and convincing that such contribution was made or that any expenses of litigation were paid by the testator. The claim that a contribution was made to the bishop's trip is predicated primarily upon the evidence of Emily Wery Hudson, the oldest surviving child. She does not testify from her own personal knowledge but from statements made by her mother in the course of a conversation with her father at which she was present when in the summer of 1898, then a young girl of sixteen, she returned to her parents' home

in Hilo after completing school, and from statements subsequently made by her mother to her when alone. She testified that upon the first occasion in the summer of 1898, when apparently the 1895 lease was under discussion, she informed her mother that the lease was not in her mother's name but in that of her father, whereupon her mother reproached her father saying that she "gave" him the money; that she had sold her Palama property and some land in Kaneohe or Heeia, one of the two, and this money she held and gave to her husband to procure this Catholic mission lease; that she gave him the money and he turned the money over to one of the "fathers" and that's how he got the Catholic mission lease. It appears from the evidence in the *Vierra* case that the bishop for the time being of the Catholic Church in Hawaii was vested with the legal title to all church property for the benefit of the church and that the legal title to the property leased to the testator was vested in Gulstan F. Ropert as Bishop of the Catholic Church in Hawaii in that way. It also appears that the bishop was represented at Hilo in respect to church lands by one of the local priests, the powers of the latter however not including the power to lease. Evidence showing or tending to show that an agent was entrusted with money for delivery to another is not sufficient to sustain a finding that the agent actually delivered the money to such other. Assuming that the testator asked his wife Hattie for money with which to acquire the lease (and Mrs. Hudson testified that her mother told her he did) and that his wife gave him money for that purpose the assumption does not include the additional necessary evidence of the payment of the money to the bishop or to any agent authorized to receive the same. The source of Hattie Wery's information that her husband had "turned the money over to one of the fathers" does not appear. It may have been the false

statement of the husband in an attempt to justify his request for or his disposition of the money. The "fathers" that Hattie Wery referred to were the local priests at Hilo. This evidence of the complainant Emily Hudson hardly admits of the insinuation that the local priests imposed upon the testator and exacted money from him upon the pretext that a donation to help defray the expenses of the bishop's European trip was a condition precedent to receiving a lease.

Further there is absolutely no evidence in the record that the testator incurred any expenses by way of attorneys' fees or otherwise in the *Vierra* case. The assumption that none were incurred by him is more reasonable than otherwise. It was incumbent upon the lessor to give possession to the lessee of the premises leased on June 1, 1895, upon failure of which under the facts the lessor was liable to the lessee in damages. Nor was the lessee bound to gain possession at his own expense if Vierra rightfully withheld the same. *Cohn* v. *Norton,* 18 Atl. (Conn.) 595, 596. The *Vierra* suit was an attempted vindication of Vierra's rights against the respondent Ropert and not against the testator, the latter having apparently been made party to the suit to bind him, if that were possible, by any decree that Vierra might secure.

No claim is made that the testator paid any expenses that his corespondent, Bishop Ropert, may have incurred in defending Vierra's suit.

Assuming, however, that a contribution was made by the testator to help defray the expenses of the Bishop's trip to Europe and that expenses were incurred by him as the result of the litigation in the *Vierra* case, neither this contribution nor this expense legally constitutes a "consideration" for or "purchase price" of the lease. It is from the payment of the consideration or purchase price of the property that the presumption arises that the pur-

chase was made for the benefit of the payor and from which the trust results to the payor. Moreover, a donation by way of contribution to the traveling expenses of another constitutes a gift. Assuming that a contribution was made by the testator to the expense of the bishop's European trip it unquestionably was a gift. There is nothing in the evidence indicating that it could have been anything but a gift. As such it was neither the "consideration" for nor the "purchase price" of the lease either in whole or in part. Restatement of the Law of Trusts, § 447; *Kennedy* v. *McCann*, 61 Atl. (Md.) 625, 628. Similarly as to the expenses of litigation. The testator as a defendant in the *Vierra* case may have incurred expenses in the way of counsel fees and otherwise in the defense of that case but if so these expenses were personal to himself in the defense of the case and not by way of consideration for the lease. Moneys spent for the acquisition of property by way of expenses do not constitute the "consideration" for nor the "purchase price" of the property unless expressly made so by the act of the parties. And there is no evidence to that effect. It is only when the consideration for or purchase price of the property has been paid for the property itself as the consideration for or the purchase price thereof that it may be said in the case of a purchase-money resulting trust that the purchase price has been paid by the payor.

Much may be said upon the facts claimed by the petitioners that if any trust were created it was a "constructive" and not a "resulting" one. 2 Bogert, Trusts, §§ 455, 458, 467 at p. 1435; 3 Bogert, Trusts, § 483; Perry on Trusts (7th ed.), § 127, p. 196, n. 51, § 167, p. 269, n. 4. The evidence of Mrs. Hudson to the effect that her mother reproached her husband for having "cheated" or "fooled" her might under certain circumstances give rise to the imputation of a breach by the testator of a fiduciary re-

lationship existing between husband and wife and that as a consequence a trust was "constructed" between them. But even were we to assume that for any reason title to the 1895 lease was wrongfully taken by the testator in his own name it could not be said upon the evidence that a constructive trust was created. The evidence necessary to sustain a constructive trust must, equally as that to create a resulting trust, be clear and satisfactory. *Kuwahara* v. *Kuwahara, supra,* p. 277. To construct a trust it was necessary for the appellees to show by clear and convincing evidence that the moneys which were allegedly contributed by Hattie Wery to the cost of the bishop's European trip or expended by her for the expenses of litigation in the *Vierra* case were traceable to the lease of June 1, 1895, or its substitute the 1897 lease and this the appellees have failed to do. While there is a marked distinction between a resulting trust and a constructive trust the incidents in a purchase-money trust whether resulting or constructive in respect to the consideration or purchase price are for all practical purposes the same. In a purchase-money resulting trust it is necessary that it appear that the money was used in payment of the consideration or purchase price. In a purchase-money constructive trust the money used must be traceable to the trust *res,* in effect constitute the consideration for or the purchase money of the trust *res.* And where, as here, the most that can be said is that a contribution was made to the expenses of a European trip of the lessor and expenses of litigation against the lessee as a corespondent were paid it cannot be said that the moneys so contributed or expended are traceable to the trust *res.* 2 Pom. Eq. Jur., § 1049; *Barger* v. *Barger,* 47 Pac. (Ore.) 702, 703, 704.

Nor does it appear by clear and convincing evidence that if moneys were used as claimed to acquire the lease in question they were paid by Hattie Wery. What the

financial condition of Mrs. Wery was in June, 1895, and prior thereto is left to speculation and surmise. It appears that she owned several pieces of suburban property but whether of any substantial value or whether improved or income-producing the record is silent. No sales of any of the property belonging to her appear of record until February 13, 1896, when she sold a portion of her holdings in Palama for the sum of $300. This sale and the proceeds thereof were advanced by appellees as the source of the contribution to the bishop's European trip and payment of the expenses of litigation. Furthermore, it does not appear that Mrs. Wery had any independent source of income or possessed any money other than that of which she was custodian for her husband. The trial judge found that all real property appearing of record in the name of the testator prior to June, 1895, was in fact the property of his wife Hattie. But there is absolutely no evidence to support the finding. On the other hand it appears by a fair preponderance of the evidence that the testator was a bricklayer by trade, worked steadily, and by reason of the excellence of his workmanship commanded high wages; that he traded in real estate netting him modest but quick profits and that from time to time he loaned money secured by mortgage upon real estate, the aggregate being considerable, measured by his earning capacity. The testator came to Hawaii in 1878 so that in 1895 he had been working at his trade for seventeen years. He was obviously thrifty and the character of his investments testifies to his conservatism. There is no reason to believe that at or about the time of the acquisition of the 1895 lease or its successor the 1897 lease he was not possessed of the small sum of $300 which the evidence implies was the aggregate amount expended. He apparently was well able to finance a lease calling for a graduated rent beginning with $50 a month and taxes for the first

ten years without assistance from his wife. There is a fair inference to be drawn from the evidence of the conduct of the household while the testator and his wife lived in Honolulu and jointly conducted the Halfway House in Nuuanu valley and of their subsequent life in Hilo, especially after the premises subject to the lease were subleased to others and rentals were paid thereunder, that Hattie Wery at all times was the custodian of her husband's money from whatever source, even including his wages. Under this condition of affairs it is hardly possible that the testator upon the occasion of the conversation between husband and wife in the summer of 1898, at which Mrs. Hudson was allegedly present, stated to his wife as testified to by Mrs. Hudson: "You know I haven't anything. I don't own anything. You know it is yours. I have none. You know I have none. It is all yours." No memoranda were made of these alleged statements by the witness and until the death of the testator there was no necessity for their recollection or repetition. Even recollection of their substance would be naturally faulty from lapse of time. A slight variation in the words employed or a misconstruction of their import would very materially and substantially alter their meaning. The death of the parties to the conversation presents opportunities for variation or misconstruction whether honestly indulged in or otherwise, that surrounds them with suspicion and counsels their acceptance only with great caution. In our opinion no confidence may be placed in the evidence of Mrs. Hudson that the testator said that he had nothing and everything belonged to his wife Hattie unless in so saying he referred to the physical fact that his wife was the custodian of his money and that he had to go to her to secure it when required by him. The same observation may be made in respect to allegedly similar declarations made subsequently by the testator prior to his wife's

death in 1916. These alleged admissions of the testator are not consistent with the facts. From all the evidence exempt from the human element of misconstruction or variation the conclusion is inevitable that if any money were used to secure either lease it was not the money of Hattie Wery but that of her husband Emil Wery.

Furthermore, there is no proof that the demise by the lessor to the testator was made at the direction of Hattie Wery. To create a resulting trust of the purchase-money type it must appear that the payor consented that title to the property purchased be vested in the grantee. 2 Bogert, Trusts, § 458. The evidence of Mrs. Hudson does not indicate that title to the 1895 lease or to that of 1897 was taken in the name of the testator at the direction of his wife. On the contrary, her reproaches, if true, would indicate that taking title in his own name was contrary to some understanding, whatever it was, to which they had previously come in that regard.

But even assuming that there was some understanding between husband and wife to the effect that title to the lease in question was to be taken in the name of the wife and that the husband contrary to that understanding took it in his own name a constructive trust would not be created unless it further appeared that a fiduciary relationship existed between the parties and that the act of the husband in taking title in himself was a breach of that fiduciary relationship. Our previous findings herein negative the existence of a fiduciary relationship between husband and wife or the breach of that relationship by the husband taking title in his own name.

This brings us to a consideration of the claim of appellees that the testator by his declarations to his wife Hattie in the summer of 1898 and subsequently during her lifetime and after her death to their children and by his conduct and otherwise created a present voluntary ex-

press parol trust and a constructive trust in all of his property for her and their children. Appellees nowhere in their brief point out how as alleged in their bill an "express and constructive" trust was created. And we can only assume that the allegation was made upon the theory that a constructive trust arose from the breach by the testator of the terms of the alleged express trust.

Much of the property held by the testator in his lifetime and the majority of his property upon his death consisted of real estate. Appellees make no claim of the existence of any memoranda or note evidencing an express trust conformable to the provisions of the statute of frauds and admit that it was entirely in parol and consisted of declarations made by the testator from time to time coupled with conduct and admissions acknowledging the existence of the trust claimed. Whether the statute of frauds would be a complete defense we do not deem necessary to a determination of the issues but in proceeding to a consideration of the merits this court is not to be taken as assuming that an express oral trust in real property may be created in parol under the circumstances of this case.

The degree of proof necessary to establish an express oral trust is governed by the same rules applicable to resulting and constructive trusts. This court has held that the subject matter of parol trusts must be "clearly ascertained" and that "loose, vague and indefinite expressions" are insufficient; *Kamihana* v. *Glade,* 5 Haw. 497, 500; that the evidence should be "clear, cogent and convincing," see *Pinheiro* v. *Pinheiro,* 32 Haw. 659, 665. To determine whether or not the appellees have established a parol express trust as claimed by the degree of proof necessary to its establishment we deem it only necessary to consider but one of the essential elements of an express trust whether in writing or in parol, namely, an intention

manifested by the settlor to create a trust. If, as we hold, the appellees have failed to show by clear and convincing evidence that the settlor manifested an intention to create a trust in all of his property for the benefit of his wife and children, the presence or absence of other essential elements of an express parol trust becomes material.

Without extending this opinion to include a minute review of the record, an analysis of the evidence leaves the court in grave doubt of any present intention on the part of the testator to create a trust when making the declarations attributed to him.

Much of the evidence offered in support of the creation by the testator of a parol trust consists of the alleged conversation between husband and wife in the summer of 1898 upon which the claim of appellees of a resulting trust is predicated, repeated in substance from time to time to the complainant Emily Hudson and to others visiting the testator's home. The weight of such portions of these conversations as applied to the claim of the creation of a resulting trust has already been commented upon. In addition the testator according to the evidence of Mrs. Hudson upon the occasion of the 1898 conversation stated to his wife in response to her reproaches that all the property was hers; that he only held it for her; that while he had it in his name the property was all hers; that it was her property and that he would handle it for her; that upon subsequent conversations with his wife in the presence of Mrs. Hudson the substance of these statements was repeated. But, by Mrs. Hudson's own admissions, upon all the occasions of these alleged statements and declarations to his wife the testator qualified them by saying that he was holding everything for her and the children; that it was all for her and the children; that he would take good care of her and the children and that she need not worry about that; that everything was for her

and the children; to leave it to him and he would straighten out everything all right for them all. Some of these declarations were made upon the occasion of his admonishing his wife against family extravagance when the additional remark was made: "Be careful," as it was for "you and the children." In the presence of a visitor the testator said to his wife: "Well, it's all going to be yours anyway." All the statements and declarations of the testator made to his wife during her lifetime when considered in the light of the qualifying language employed are perfectly consistent with the assurances of the normal husband and father that whatever he might accumulate in the way of this world's goods would ultimately be enjoyed by his wife and children and that thrift and even parsimony would ultimately redound to her and their benefit. This conclusion finds emphasis in his remonstrances against household extravagance upon the occasions of which he sought to justify his rebukes by the suggestion that economy practiced by his wife would redound to her and their children's benefit.

There is ample evidence to sustain a finding, in fact the evidence preponderates to the effect that after June 1, 1895, both during his wife's lifetime and for a considerable period after her death, the testator worked steadily at his trade enjoying in addition to substantial wages profits from lucrative construction contracts performed by him singly or with associates. The ability of the testator in 1901 to take his family of five on a trip to Europe testified to his earning capacity. The value of the estate left by him does not indicate profligacy. It is reasonable to conclude from all the evidence that the rents from his personal estate were substantial and were conserved and used by him in part at least in acquiring the property which he did. This evidence is certainly inconsistent with the statements accredited to him that he had nothing and that everything belonged to his wife.

There were occasions, during the life of Hattie Wery, of conversations had between husband and wife, when statements of the testator might indicate a recognition by him of an interest held by his wife in his property. Upon one occasion in the presence of a visitor he asked his wife if she had fixed up a new lease and she replied that it was none of his business, to which he rejoined: "That belongs to you. I got nothing to say whatever. You lose out that is your own business. That is yours." Upon another occasion in reference to rents collected and in her possession Hattie Wery said: "Now, this is yours and this is mine. This is all mine and that is yours." This evidence, however, is consistent with the independent ownership by Hattie Wery of property from which rent accrued and from the lessees of which rent was collected at the same time as rent was collected from the sublessees of the testator and deposited with Hattie Wery for disposition. Hattie Wery in 1905 acquired the fee of certain Catholic mission property immediately adjoining the premises subject to the 1897 lease and to premises subject to another lease of mission property which the testator had acquired in 1902. The property acquired by Hattie Wery was subject to a lease at the time of the acquisition and a part of the premises was leased by Hattie Wery in her lifetime. Mr. Wery's work took him to places on the Island of Hawaii too far distant to commute daily where he remained until his work was completed sometimes consuming a period of months. This condition was quite frequent and due to his absence the collection of the rentals was delegated sometimes to his wife and for more extended periods to his daughter Mrs. Hudson, assisted by the latter's husband. All these rentals were delivered in the first instance to Mrs. Wery. And she in turn, prior to the establishment of a local bank, in order to their safe keeping retained them in her possession and after the establish-

ment of a local bank deposited them therein in the name of her husband. No doubt under the circumstances more often than not the aggregate rentals held by Mrs. Wery contained rentals belonging personally to her. But however collected and however they may have passed through the hands of intermediaries they were eventually paid over to and retained by the testator except when, in 1921, one of the local banks to whom the testator was indebted upon mortgage collected them personally and applied them to the testator's obligations as mortgagor.

Nor does anything appear in the evidence after Hattie Wery's death to indicate a present intention in the testator to create a trust in any of his property in favor of his wife and children. No administration was had upon the estate of Hattie Wery. Upon failure of the testator to secure administration, application therefor could have been made to the appropriate court by the daughter. When requested by his daughter Mrs. Hudson to secure administration he, according to her evidence, said that it was unnecessary, in effect that he could do the administering himself and in order that there be no confusion between the rentals collected from the property owned by Hattie Wery at the time of her death and the rentals collected from his own subleases, in August, 1919, upon the occasion of giving his daughter Emily written authority to collect "all rentals due me" and fixing the commission payable to her for such collections instructed her to "credit my account with rents collected from the property of Hattie Wery estate as I am responsible to the heirs for any moneys received from this estate" and to "pay cost of litigation in connection with any of my property or property of Hattie Wery estate." This letter was prepared by Mrs. Hudson. In this connection it must be borne in mind that the testator had a curtesy interest in the real estate owned by his wife and of which she died seized.

Again, Mrs. Hudson, in writing to her father on June 7, 1928, advised him that the "Bishop Bank had not collected some rent which is still due you on the Wainuenue property" (the property subject to the lease of 1897) and suggested that she collect the rentals in arrears and send them to her father. In commenting upon the dereliction of the local bank she advised her father that it had not treated him right; that they had taken no interest in his business and that was how he had lost his ("your") Wainuenue lease. The statements contained in these two letters are hardly consistent with a subsisting oral trust.

None of the earmarks of an express trust appear. From June, 1895, to the time of his death the testator dealt with the property of which for the time being he was seized or possessed for his own benefit and not for the benefit of his wife Hattie nor for the benefit of their children after their mother's death. The record title to all the real estate acquired by him during that period was in the name of the testator alone. The ultimate disposition of rentals collected has already been referred to. No income from his property was distributed either to his wife or after her death to their children. The testator despite alleged declarations of trust continuously exercised the exclusive rights of ownership over his property. He committed nothing to writing by which a trust might be evidenced. He discussed the ultimate disposition of his property by will in one instance advising his son of the provisions of an existing will in respect to him and upon another instance threatening his daughter Mrs. Hudson with disinheritance. He finally disposed of his property by will in the case of his son William, favoring his son's lawful issue to the exclusion of their father, and in the case of his daughter Emily Hudson cutting her off with but the sum of $1 and creating trusts reasonably calculated to survive all of his children and in favor of grand-

children. These facts are inconsistent with any alleged intention to create a trust.

The appellants contend that the complainants are barred by laches and by the statute of limitations. This defense is not considered by the court further than the facts that give it support bear upon the weight of the evidence adduced by appellees. Hattie Wery, if she did not know it before, was definitely advised in the summer of 1898 that the lease of June 1, 1895, was not in her name. She survived that knowledge by eighteen years. Although it is claimed that she accused her husband of "cheating" and "fooling" her she never took any steps to assert her alleged beneficial interest in the leasehold estate created by the lease of 1895 or its successor the lease of 1898, nor to reduce to possession the rents, issues and profits thereof. In the meantime with but slight minor exceptions the rentals from the subleases of the property were collected either by the testator or by his daughter, Emily Hudson, and with the knowledge and consent of Hattie Wery delivered to and retained by the testator. The acquiescence therein of Hattie Wery is indicated by the remark attributed to her by her daughter Mrs. Hudson when she in reply to her husband's assurances said: "Well, I wish you will do the right thing by me and the children." Hattie Wery died in July, 1916, and despite the exclusive control by the testator of all his property and his personal use of all the rents, issues and profits thereof, no steps were taken by the complainants to establish any beneficial interest in the property subject to the alleged trust or the income accruing therefrom or the property into which the same was converted until the death of the testator and then only after an unsuccessful effort to contest their father's will on the ground of mental incapacity.

No express trust appearing it cannot be said that a constructive trust arose out of any subsisting express trust.

The learned trial judge apparently was profoundly impressed by what he believed to be the injustice of the terms of the will of the testator and this no doubt influenced him in coming to the conclusions which he did. He even went to the extent of holding that the testator was not of sound and disposing mind at the time of the execution of the will and codicil thereto and that undue advantage was taken of him by the trust company nominated as the executor thereof and trustee thereunder. To the extent that the will might throw light upon the issues it was competent and material evidence. But the will had been duly admitted to probate after the children, including these petitioners, had had ample opportunity under the caveat filed by them to present evidence as to the mental competency of the testator. The order of probate stood unreversed. With the justice of the terms of the will or the legal effect the court in this proceeding had no concern. Holding, as we do, that the property of which the testator died seized and possessed was not subject to any trust it is unnecessary to consider what power if any the circuit judge in chambers possessed to disregard the terms of a will duly admitted to probate.

We deem comment upon the powers of this court to review the findings of fact of a circuit judge at chambers to be unnecessary. Much would be but repetition. Suffice it to say that where, as in this case, the creation of trusts claimed rests in parol and the evidence of those seeking their enforcement is of slight weight and of doubtful character this court will refuse to adopt findings of the trial judge sustaining their creation.

The decree appealed from is reversed and the cause

remanded to the trial judge with instructions to dismiss the bill.

*B. S. Ulrich* (also on the brief) for petitioners.

*R. A. Vitousek* (*Smith, Warren, Stanley & Vitousek* on the briefs) for respondents.

*E. R. McGhee* filed a memorandum on his own behalf, on professional ethics.

*W. B. Pittman,* Attorney General, and *J. V. Hodgson,* First Deputy Attorney General, amici curiae, on professional ethics.