# SONOSABURO ISHIDA *v.* GEORGE K. NAUMU.

## No. 2318.

Submitted October 8, 1937.                    Decided November 22, 1937.

### Coke, C. J., Banks and Peters, JJ.

OPINION OF THE COURT BY COKE, C. J. .

The appellee Sonosaburo Ishida instituted a suit in the circuit court of the first judicial circuit "to enforce trust" and to be decreed the owner of a dwelling house and lot situated on Dement Street, Honolulu. From a decree granting the prayer of appellee's petition George K. Naumu, one of the respondents, has appealed to this court.

In August, 1924, Ishida was married to Sawa Okubo. At the time of his marriage and for many years prior to that event Ishida was employed as a cook on sailing vessels in the lumber trade, plying between Hawaii and the Puget Sound region. Following his marriage Ishida continued in his former vocation. The nature of his employment was such that the greater part of his time was spent outside of Hawaii. He received an average monthly salary of about $115. At the time of the marriage and for some months thereafter Ishida, while at this port, lived with his wife, her father and mother and Sawa's divorced sister and children, in a small building on Jack Lane under lease to Sawa's father. Ishida testified at the trial in the circuit court that shortly following the marriage he decided to acquire a larger home for himself, his wife and her relatives, and on the eve of his departure for the mainland he discussed the subject with his wife and placed with her the sum of $1500 in cash, a part of which was for household purposes and a part to be applied toward the purchase of a new home. Some months elapsed but finally a suitable place

was found, the purchase price being $4000. Sawa entered into a purchase and sale agreement with the owner making a down payment of $600, the balance thereof to be paid off at the rate of $45 per month. The $600 represented a part of the $1500 theretofore placed by Ishida with Sawa. At the time or shortly after the execution of the agreement of sale Ishida and Sawa moved into the building on the newly acquired premises and jointly occupied the same as a home until Sawa's death in 1935. The installment payments were kept up until January 11, 1927, at which time there remained a balance of $2950 due the owner. Ishida and Sawa thereupon borrowed upon their joint note from the Bank of Hawaii the sum necessary to discharge the obligation to the owner of the property and Sawa executed a mortgage as security to the bank for the loan in question. The obligation to the bank was finally paid off on September 3, 1930, and a satisfaction of the mortgage was recorded in the office of the registrar of conveyances.

At the time Sawa died, in July, 1935, the legal title to the property was vested in her. Shortly after her death George K. Naumu, respondent-appellant, appeared and claimed the property as the sole heir-at-law of Sawa. The present suit was instituted by Ishida to obtain a decree of the chancery court vesting title in him on the grounds that he had furnished all the funds required for the purchase of the property and that Sawa merely held the legal title as his trustee. Ishida avers in his bill: "That though the legal title to said property was in the said Sawa Ishida, petitioner was the owner thereof and furnished the entire consideration for the purchase of said property. That the legal title to said property was put in the name of said Sawa Ishida as a matter of convenience between the parties for the reason that at the time of said purchase petitioner was employed on a sailing vessel and was absent from the Territory of Hawaii for considerable periods of time, and frequently

unable to be present to make tax returns and otherwise care for said property. That said Sawa Ishida contributed no part of the purchase price of said property and it was always understood and agreed between the respective parties that the legal title would be placed in the name of petitioner whenever he so desired."

The other respondent, Tei Okubo, mother of Sawa, filed an answer admitting all of the allegations of the petition and disclaimed any interest in the premises involved in the suit.

Ishida claims that these facts created a resulting trust in his favor and that any presumption that the conveyance was an advancement or gift to the wife has been overcome by the evidence showing that the consideration for the property was paid by petitioner upon an agreement by Mrs. Ishida to convey the title to him upon request. If this were an attempt to enforce an oral express trust the petitioner would be barred from recovery under section 3900, R. L. 1935, known as the "statute of frauds." But our statute, similar to the English statute of frauds and the statutes of many of the American States, does not stand in the way of one who seeks to enforce a resulting trust. "It was provided by the English Statute of Frauds, 29 Charles II, c. 3, sec. 7, that all declarations or creations of trusts of land shall be manifested and proved by some writing signed by the party who is by law enabled to declare such a trust * * *. This provision is applicable to express trusts, but not to resulting or constructive trusts." Restatement, Trusts, p. 1251.

"An express trust is created only if the settlor manifests an intention to create it * * * although the manifestation may be made by written or spoken words or by conduct * * *. A person who seeks to establish the existence of an express trust must show that the settlor manifested an intention to create it. On the other hand, in the case of a resulting trust it is not necessary to show that the settlor

manifested an intention to create it. A person who seeks to establish the existence of a resulting trust does so by showing circumstances which raise an inference that the person making or causing a transfer of property did not intend to give to the transferee the beneficial interest in the property. Since the transferee is not to have the beneficial interest and since no other effective disposition is made of it, the person who made or caused the transfer of his estate is entitled to it. A resulting trust is imposed for the purpose of carrying out what it appears from the circumstances under which a disposition of property is made would probably have been the intention of the person making the disposition if he had thought of the matter. * * * If a person purchases property but takes title in the name of another, the inference is that he did not intend the transferee to have the beneficial interest, but that the transferee should hold the property for the benefit of the purchaser. * * * The trustee of a resulting trust, like the trustee of an express passive trust, is ordinarily under a duty merely to convey the property to the beneficiary or in accordance with his directions * * *. Thus, if a transfer of property is made to one person and the purchase price is paid by another, it is the duty of the transferee to convey the property to the person who paid the purchase price whenever he demands such conveyance. * * * A resulting trust arises where a transfer of property is made under circumstances which raise an inference that a person making a transfer or causing a transfer to be made did not intend the transferee to have the beneficial interest in the property transferred." Restatement, Trusts, pp. 1246-1249.

Maitland says that trusts are created (1) by act of a party and (2) by the operation of law, and divides the former into express and implied trusts and the latter into resulting and constructive trusts. (See 27 Harv. L. Rev. p. 437.) In a slightly different manner Bogert places trusts

in two separate groups classified as express trusts which he subdivides into private trusts and charitable or public trusts, and implied trusts subdivided into resulting trusts and constructive trusts. (See 1 Bogert, Trusts p. 7.) There perhaps may be some justifiable criticism of these classifications. But they are helpful in solving one of the most perplexing refinements of the law of trusts.

The Supreme Court of the United States, in *Smithsonian Institution* v. *Meech,* 169 U. S. 398, cited with approval the decision of the supreme court of Iowa in *Cotton* v. *Wood,* 25 Iowa 43, where the facts were that the husband purchased a lot and had the same conveyed to his wife under an agreement that she would convey it to him or to whomsoever he might assign his interests therein upon his request. The wife died without making any conveyance and it was held that the husband might maintain a suit to compel a conveyance to him by her heirs, the Iowa court saying: "Where, upon the purchase of property, the consideration is paid by one, and the legal title conveyed to another, a resulting trust is thereby raised, and the person named in the deed will hold the property as trustee of the party paying the consideration. See Hill on Trustees, 91, and authorities cited in notes; 2 Story's Eq. Juris. § 1201. But if the person to whom the conveyance is made be one for whom the party paying the consideration is under obligation, natural or moral, to provide, the transaction will be regarded *prima facie* as an advancement, and the burden will rest on the one who seeks to establish the trust for the benefit of the payee of the consideration, to overcome the presumption in favor of the legal title by sufficient evidence." The Supreme Court of the United States further says: "We think it clear from these authorities, and many others that might be cited, * * * that the doctrine of an implied and resulting trust applies to a case in which the husband advances the purchase price for property which is conveyed to his wife,

and that though it be true there is a presumption that the conveyance was intended as an advancement for her benefit, yet such presumption is subject to overthrow by proof of an agreement that such was not the purpose of the conveyance. And so the case comes back to the question of fact in respect to which we have already expressed our conclusions, whether there was sufficiently clear and positive evidence that this conveyance to Mrs. Avery was not intended as an advancement, but was made simply for the purposes of convenience and upon the agreement that this lot, together with other property belonging to Mr. Avery, should pass after both were dead to the Smithsonian Institution." In the same case the court further announced the rule that "The existence of an express agreement does not destroy the resulting trust. It was not an agreement made by one owning and having the legal title to real estate by which an express trust was attempted to be created, but it was an agreement prior to the vesting of title—an agreement which became a part of and controlled the conveyance; and evidence of its terms is offered, not for the purpose of establishing an express trust, but of nullifying the presumption of an advancement and to indicate the disposition which the real owner intended should be made of the property."

In *Wery* v. *Pacific Trust Co.*, 33 Haw. 701, this court, discussing the doctrine of resulting trusts, emphasized the doctrine that the existence of a resulting trust must be established by evidence which is clear and convincing and approved the rule laid down by Bogert (see 2 Bogert, Trusts § 452) to the effect that resulting trusts of the purchase money type are regarded by the courts with suspicion and as possible instruments of depriving a person of his property by fraud and perjury.

Whether the decree under review in the present proceeding should be sustained depends first upon the sufficiency of the evidence to establish petitioner's averment that the

consideration for the property in question was advanced by him, and second the existence of that quantum of evidence which is sufficient in law to overcome the legal presumption that the conveyance from Ishida to his wife was intended as an advancement.

Because of his deficiency in the knowledge and use of the English language a portion of Ishida's testimony was given through the medium of a Japanese interpreter. He however testified positively that all of the money required to purchase the property was supplied by himself and that his wife Sawa made no contribution whatever. In an equally positive manner Ishida testified that there was an express understanding between himself and his wife at the time the initial steps were taken to acquire the property that for the sake of convenience the title should be temporarily reposed in Sawa, subsequently to be conveyed to Ishida upon his request. The statement of Ishida that the purchase money was supplied by himself alone is in a substantial measure corroborated by Minnie Yamada, sister of Sawa and an aunt of the appellant. This witness testified that she knew of the plan of Ishida and his wife to purchase a home and she further testified that her sister Sawa told her that Ishida, shortly after the marriage, had turned over to Sawa $1500 to be used for buying the property and the remainder for family upkeep. Ishida's testimony is further corroborated by some thirty odd postal money order receipts introduced at the trial indicating postal exchange purchased during the years 1925-1930 by Ishida at Hoquiam, Bellingham, Aberdeen and other parts in the State of Washington, payable to Sawa, his wife. The aggregate of these remittances amounted to over $2500 and represented moneys earned by Ishida while employed as ship's cook. In some instances the postal money orders were cashed by Minnie Yamada and the proceeds applied by her directly upon the indebtedness on the property.

Sawa acquired title by virtue of a series of transactions beginning in 1924 and ending in 1930. The entire consideration according to Ishida was paid by him within that period, hence the general rule to the effect that to create a resulting trust of this type the whole consideration must have been paid or secured at the time or prior to the purchase (see *Olcott* v. *Bynum,* 17 Wall. 44; *Ducie* v. *Ford,* 138 U. S. 587, 3 Pom. Eq. Jur. § 1037) has been satisfied.

The agreement by which Sawa temporarily was to take title to the property under the circumstances related by Ishida cannot be deemed to have been unusual or unnatural. The petitioner was a seafaring man on ships engaged in foreign trade and while thus employed it is not difficult to understand the desire of both the husband and wife that the latter for the time being should hold the legal title to the property. Here again the testimony of Ishida detailing the understanding between the parties is strongly supported by Minnie Yamada. (See margin for excerpt from her testimony.) From this it is fairly inferable that Sawa

"Q  Now, we are asking you what was said about buying some real property?

A  Well, he [Ishida] suggested to buy a place, to look around, to look around for property and we did.

Q  Well, what kind of property, farm land?

A  Oh, no, just dwellings.

Q  Dwellings. All right.  A  Yes.

Q  Did you and Sawa look around then?

A  Yes, sir, we looked around.

Q  Now, was there any discussion, talk at that time or right after that with regard to the title, who should have the title to the property?

A  Well, he was away, Mr. Ishida was away most of the time and I suggested to put it in my sister Sawa's name.

Q  It was at your suggestion?  A  Yes, sir.

Q  When the property was purchased was that carried out, put in her name?  A  Yes, sir.

Q  Was anything said at any other time thereafter about putting it in Ishida's name?  A  Yes, sir, they did, and I told my sister she can put it back in her husband's name any time she wanted to. She agreed to it."

Tr. pp. 65, 66.

understood that she was merely holding the legal title to the property in trust for her husband Ishida to be conveyed to him at some future time when called upon by him to do so. Appellant further urges that the petitioner's right to recover is barred by laches. This rule is based upon the doctrine that equity will only help the diligent. The principle laid down by Lord Camden, more than a century ago, is still the guide of the court in cases where the party seeking its aid has been guilty of great delay. He said: "A court of equity, which is never active in relief against conscience or public convenience, has always refused its aid to stale demands where the party has slept upon his rights or acquiesced for a great length of time. Nothing can call forth this court into activity, but conscience, good faith and reasonable diligence. Where these are wanting, the court is passive and does nothing; laches and neglect are always discountenanced." *Norfolk and New Brunswick Hosiery Co.* v. *Arnold,* 49 N. J. Eq. 390, 397.

"Q  * * * When was it that you suggested to Ishida that the new place was to be bought in the name of your sister?

A   That is when he came back on the second trip.

Q   Where did that talk take place?  A   Up in Jack Lane.

Q   What did you say to him about that?

A   We were finding out to see in whose name to put in the title and I stated that he was on the sea most of the time so I suggested to put it in her name.

Q   Who first spoke about that?  A   I spoke about it.

Q   What did you first say about it?

A   We wanted to know. I said to put the title in my sister Sawa's name.

Q   Is that all you said?  A   Well, I can't remember what was said.

Q   You said to Ishida, 'Put the title in your wife's name', is that it?

A   Yes, sir.

Q   Is that it, words to that effect? What did you say as to your reason for that?  A   He was not on land all the time.

Q   Did you tell him that?  A   Yes, sir.

Q   What did you say about that?  A   I told my sister and Mr. Ishida, my brother-in-law, that he was not on land most of the time; that it was best to have it in my sister's name and they both agreed to it." Tr. p. 79.

In *Hammond* v. *Hopkins,* 143 U. S. 224, 250, the court said : "No rule of law is better settled than that a court of equity will not aid a party whose application is destitute of conscience, good faith and reasonable diligence, but will discourage stale demands, for the peace of society, by refusing to interfere where there have been gross laches in prosecuting rights, or where long acquiescence in the assertion of adverse rights has occurred. The rule is peculiarly applicable where the difficulty of doing entire justice arises through the death of the principal participants in the transactions complained of, or of the witness or witnesses, or by reason of the original transactions having become so obscured by time as to render the ascertainment of the exact facts impossible." After announcing this principle, the court, however, went on to point out that "Each case must necessarily be governed by its own circumstances, since, though the lapse of a few years may be sufficient to defeat the action in one case, a longer period may be held requisite in another, dependent upon the situation of the parties, the extent of their knowledge or means of information, great changes in values, the want of probable grounds for the imputation of intentional fraud, the destruction of specific testimony, the absence of any reasonable impediment or hindrance to the assertion of the alleged rights, and the like."

In the case at bar it appears that both Ishida and his wife were in joint occupancy of the property in question and it has been held that "joint possession by cestui que trust and trustee rebuts the idea of laches, since it shows a recognition of the interest of the beneficiary." And further, that among the facts excusing delay and rebutting the imputation of laches is "family relationship between the alleged cestui and trustee, making a settlement of differences out of court more natural." 4 Bogert, Trusts § 949.

The complete title of the property in question was not

374

vested in Sawa until the discharge of the mortgage had by the Bank of Hawaii on September 3, 1930. She died five years later. In view of the joint possession of the property by Sawa and her husband and their relationship we think that while the delay on the part of Ishida to assert and enforce his rights bears upon the weight of his evidence it is not sufficient to bar his claim to equitable relief.

This court has repeatedly refused to disturb the finding of a circuit judge sitting in equity where such finding depends upon the credibility of the witnesses and the weight of conflicting testimony. In *McCandless* v. *Castle*, 25 Haw. 22, 33, the court said: "On an appeal in an equity case the findings of fact by the circuit judge are not binding on the supreme court, but where the findings depend upon the credibility of witnesses and the weighing of conflicting testimony such findings are entitled to great weight." (See also *Sumner* v. *Jones*, 22 Haw. 391; *Scott* v. *Pilipo*, 24 Haw. 277; *Jellings* v. *Garcia*, 29 Haw. 698; *Pinheiro* v. *Pinheiro*, 32 Haw. 659.)

Counsel for appellant in their supplemental brief submitted at the request of the court have injected into the case for the first time an issue of law which calls for a consideration of the provisions of section 2994, R. L. 1925. This statute provides: "A married woman may make contracts, oral and written, sealed and unsealed, in the same manner as if she were sole, except that she shall not be authorized to make contracts for personal service without the written consent of her husband, nor to contract with her husband." Counsel point out that this statute was in force concurrently with all of the transactions between Ishida and his wife relating to the property and they advance the theory that as the trust, if any, was the creature of a void contract it could have no legal existence. There would perhaps be merit in this contention if we were dealing with a suit to enforce an express trust as distinguished from a resulting

or constructive trust. The former, as indicated *supra,* is created by the act of the parties and has its basis in a contract either express or implied between them while resulting or constructive trusts come into being by operation of law. They are "trusts that the courts presume to arise out of the transactions of parties, as if one man pays the purchase-money for an estate, and the deed is taken in the name of another. Courts presume that a trust is intended for the person who pays the money." 1 Perry, Trusts (6th ed.) pp. 17, 18. For the foregoing reasons section 2994, R. L. 1925, has no application to the case at bar.

Appellant complains that he has been wrongfully taxed with an item of $1.50 which is included in petitioner's bill of costs for service of copy of petition on appellant's corespondent Tei Okubo. This item of attorneys' fees is not taxable against the appellant under section 3791, R. L. 1935, and the decree appealed from should be modified by reducing the amount of money judgment entered against appellant to the sum of $26.75. In all other respects the decree appealed from is affirmed.

The cause is remanded with directions to the circuit court to modify the decree accordingly.

*W. H. Heen* and *M. K. Ashford* for appellant.

*E. J. Botts* for appellee.